BOUDIN, Chief Judge.
 

 This case presents a three-way dispute among two Indian tribes, the Environmental Protection Agency (“EPA”) and the State of Maine (“Maine”). The two tribes are the Penobscot Nation and the Passa-maquoddy Tribe (collectively, “the southern tribes”). Also involved are two different statutory regimes: the Clean Water Act, 33 U.S.C. § 1251
 
 et seq.
 
 (2000), which the EPA administers in the first instance, and a pair of interlocking federal and state statutes—the Settlement Acts
 
 [1]
 
 —that govern Maine’s authority vis-a-vis Maine tribes.
 

 Among other things, the Clean Water Act empowers the EPA to issue permits for the discharge of pollutants into naviga
 
 *40
 
 ble waters. 33 U.S.C. § 1342(a). On certain conditions, the statute entitles states to administer their own permitting programs in place of the EPA’s.
 
 Id.
 
 § 1342(b). A state desiring to do so must apply to the EPA, and if the state has “adequate authority to carry out the described program,” and other requirements are met, the EPA “shall approve” the program.
 
 Id.
 

 The present litigation has its origins in such an application. On November 18, 1999, Maine submitted its application under section 1342(b) to take over discharge permitting in Maine. The Clean Water Act sets a 90-day period for the EPA to review the application.
 
 Id,
 
 § 1342(c)(1). Once this period has expired, the EPA
 

 shall suspend the issuance of permits under subsection (a) of this section as to those discharges subject to such program unless [the Administrator] determines that the State permit program does not meet the requirements [of section 1342(b) ].
 

 Id,
 

 The application presented questions as to what authority the State had vis-a-vis the southern tribes—in particular, as to discharges connected to tribal members or entities, tribal waters or tribal activities. The EPA and Maine agreed to extend the 90-day review period four times,
 
 see
 
 40 C.F.R. § 123.21(d), eventually setting September 26, 2000, as the new deadline. This deadline also expired without an EPA decision, and the EPA then suspended its own issuance of new permits, as section 1342(c)(1) commands.
 

 In January 2001, the EPA approved the State’s program in all areas of Maine “outside disputed Indian territory,” but took no “final action on the issues related to the State’s jurisdiction and the applicability of State law in Indian country for the purposes of implementing the NPDES program in those areas.” State Program Requirements, 66 Fed.Reg. 12,791, 12,795 (Feb. 28, 2001).
 
 [2]
 

 Then, in October 2003, the EPA concluded that Maine had authority to regulate nineteen discharge facilities owned by non-Indians located outside, but discharging to boundaries within, the territorial waters of the southern tribes.
 
 [3]
 
 The EPA reached the same conclusion as to a facility located outside tribal territory but owned and used jointly by the Passamaquoddy Tribe and a neighboring municipality. 68 Fed.Reg. at 65,052, 65,054 & n. 4, 65,056.
 

 However, the EPA refused to approve the State’s plan as applied to two tribal-owned facilities located on tribal lands and discharging into navigable waters within the southern tribes’ territories but which thereafter pass other downstream communities.
 
 Id.
 
 at 65,066. The EPA found that discharges from these facilities were “immaterial” and had no “substantial effect [ ] on non-members”; and it concluded that their regulation was an “internal tribal matter” over which the State lacked adequate authority.
 
 Id.
 
 As to these two facili
 
 *41
 
 ties, the EPA retained permitting authority.
 
 Id.
 

 Additionally, the EPA expressed concern that Maine’s permitting program might not ensure water quality standards adequate to protect the southern tribes’ right to fish for individual sustenance,
 
 id.
 
 at 65,067—a right assertedly guaranteed to the tribes by state law. 30 M.R.S.A. § 6207(4). Citing its authority to object to specific state permits and to retake permitting authority from the states under certain conditions, 33 U.S.C. § 1342(d), the EPA said that it would “require the state to address the tribes’ uses consistent with the requirements of the CWA.” 68 Fed. Reg. at 65,068.
 

 Petitions for judicial review, which we have consolidated, followed. The southern tribes say that the EPA erred in approving Maine’s program as to the nineteen non-tribal facilities that discharge into tribal waters. They argue that the Settlement Acts reserved to the tribes authority (vis-a-vis the State) to regulate pollution by non-Indians within the tribes’ territories, and that the EPA has a trust obligation to retain permitting authority to facilitate tribal control over the tribes’ natural resources.
 

 For its part, Maine defends the EPA as to the nineteen facilities but contends that the EPA erred in exempting the two tribal-owned facilities from the state permitting program. Several towns and other entities subject to permitting under the Clean Water Act have intervened in favor of Maine’s authority; but in addition, they say that state permitting authority as to
 
 all
 
 the facilities has already come into force by operation of law.
 

 Our review is
 
 de novo
 
 as to issues of law, 5 U.S.C. § 706;
 
 Penobscot Air Servs., Ltd, v. FAA,
 
 164 F.3d 713, 718-19 (1st Cir.1999), except that the EPA gets a measure of deference in applying ambiguous terms m any statute it administers, including the Clean Water Act.
 
 Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc,,
 
 467 U.S. 837, 842-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). As to factual matters, the EPA is entitled to deference unless its findings are unreasonable.
 
 Adams v. EPA,
 
 38 F.3d 43, 49 (1st Cir.1994).
 

 The extent of Maine’s authority as to the southern tribes has a unique history. In the later 18th and early 19th centuries, Maine was part of Massachusetts and agreements between Massachusetts and Maine tribes appeared to surrender much or all of the tribes’ aboriginal sovereignty. H.R. Rep. 96-1353, at 12 (1980),
 
 reprinted in
 
 1980 U.S.C.C.A.N. 3786, 3787. Until the 1970s, Maine and its courts considered the tribes to be “as completely subject to the state as any other inhabitants can be.”
 
 State v. Newell,
 
 84 Me. 465, 24 A. 943, 944 (1892). Similarly, the federal government had “repeatedly denied that it had jurisdiction over or responsibility for the [Maine tribes].” 25 U.S.C. § 1721(a)(9).
 

 In the 1970s, the Passamaquoddy Tribe filed a lawsuit laying claim to much of the entire territory of Maine, arguing that its agreements with Massachusetts were invalid because never approved by Congress. When the suit was successful as to the latter issue,
 
 Bottomly v. Passamaquoddy Tribe,
 
 599 F.2d 1061, 1065 (1st Cir.1979), Maine—with federal support—negotiated a compromise with the Passamaquoddy Tribe and the Penobscot Nation. This was reflected in a 1980 Maine statute, ratified by a federal statute also in 1980, collectively, “the Settlement Acts,” note 1, above.
 

 For the southern tribes, the Settlement Acts “confirmed [their] title to designated reservation lands, memorialized federal recognition of [their] tribal status, and opened the floodgate for the influx of mil
 
 *42
 
 lions of dollars in federal subsidies.”
 
 Passamaquoddy Tribe v. Maine,
 
 75 F.3d 784, 787 (1st Cir.1996). The Settlement Acts also protected to a limited extent the southern tribes’ sovereignty by “recognizing their power to control their internal affairs and by withdrawing the power which Maine previously claimed to interfere in such matters.” H.R.Rep. No. 96-1353, at 15,
 
 reprinted in
 
 1980 U.S.C.C.A.N. 3786, 3790.
 

 In Maine’s favor, the Settlement Acts extinguished the tribes’ remaining claims to vast tracts of Maine land, 25 U.S.C. § 1723, and extended state authority well beyond what is customary for Indian tribes elsewhere in the United States. Of particular importance, the Maine statute, ratified by the federal one, provided that “with very limited exceptions,”
 
 Akins v. Penobscot Nation,
 
 130 F.3d 482, 484 (1st Cir.1997), the southern tribes would be “subject to” Maine law;
 

 and any lands or natural resources owned by them [or] held in trust for them ... shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person ... or natural resources therein.
 

 30 M.R.S.A. § 6204.
 
 [4]
 

 In this, and in a number of other respects described below, Maine’s power over the southern tribes greatly narrows ordinary tribal sovereignty vis-a-vis state law. Yet, professedly in recognition of the southern tribes’ remaining inherent sovereignty, H.R. Rep. 96-1353, at 15,
 
 reprinted in
 
 1980 U.S.C.C.A.N. 3786, 3790, the Settlement Acts provide that, for the Penob-scot Nation and the Passamaquoddy Tribe, “internal tribal matters” are not “subject to regulation by the State.” 30 M.R.S.A. § 6206(1). This qualification does not apply to other Maine tribes, who are fully subject to Maine law.
 

 On its face, section 6204’s reservation of authority over the tribes’ lands and natural resources, “to the same extent as any other person,” might appear explicitly to satisfy the requirements of the Clean Water Act that a state seeking to issue its own permits have “adequate authority to carry out the described [state permitting] program.” 33 U.S.C. § 1342(b). On several grounds, the southern tribes argue otherwise.
 

 The southern tribes’ broadest claim is that their inherent sovereignty remains intact and therefore state regulatory power over their lands is exceedingly limited. The premise is mistaken: the explicit language of the Settlement Acts establishes state authority that far exceeds what is normal for Indian tribes to which no such legislation applies. 30 M.R.S.A. § 6206(1). As
 
 Akins
 
 explained, 130 F.3d at 484, the southern tribes are subject to the laws of Maine with “very limited exceptions.” This markedly contrasts with the status of Indian tribes in other states not subject to the Settlements Acts.
 
 E.g., Santa Clara Pueblo v. Martinez,
 
 436 U.S. 49, 63-64, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).
 

 In addition to Maine’s explicit authority over tribal lands and natural resources, the Settlement Acts expressly divested the Maine tribes of sovereign immunity, 25
 
 *43
 
 U.S.C. § 1725(d), and with limited exceptions, made the Maine tribes subject to the general criminal and civil law of Maine even with respect to activities carried out on tribal lands. 25 U.S.C. § 1725(a), (c); 30 M.R.S.A. § 6204. Underscoring these limitations, special provisions protect Maine law against inadvertent preemption by present and future federal statutes affecting other tribes. 25 U.S.C. §§ 1725(h), 1735(b);
 
 Passamaquoddy Tribe,
 
 75 F.3d at 787.
 
 [5]
 

 The southern tribes cite to House and Senate reports referring to the sovereignty of the Maine tribes as equal to that of other Indian tribes, H.R. Rep. 96-1353 at 14; S. Rep. 96-957 at 14 (1980), but the reports are referring to the view adopted by the
 
 Bottomly
 
 decision—which preceded and indeed precipitated the Settlement Acts.
 
 See
 
 68 Fed.Reg. at 65,060. And the Settlement Acts were a compromise by which land claims were limited, federal funds paid over, and the authority of the tribes and the State redefined on a new basis, closer to Maine’s historic treatment rather than the full sovereignty asserted by the tribes.
 

 This temporal distinction is borne out explicitly in a passage in the Senate Report, adopted as well in the House Report. This makes dear that the statutory compromise “extended” state power over “Indian territory”—thereby reviving the pre-litigation state of affairs—with the caveat that tribal sovereignty would be “strengthened” to the extent of withdrawing Maine’s prior assertion of authority over “internal affairs.” S. Rep. 96-956 at 14; H.R. Rep. 96-1353 at 15.
 

 The southern tribes say that state authority over land and water resources can coexist with tribal authority, pointing to certain provisions of the Settlement Acts that explicitly make state authority “exclusive.”
 
 [6]
 
 So, the tribes say, the existence of Maine’s authority does not automatically negate concurrent tribal authority over the same subject matter. But the question here is whether
 
 Maine
 
 has adequate authority to implement permitting as to the tribes’ lands, and section 6204 on its face is about as explicit in conferring such authority as is possible. What the tribes might do if Maine did
 
 not
 
 legislate is beside the point.
 

 The southern tribes’ concurrency argument would have bite only if their own “concurrent” regulatory authority, if it existed, took priority over enacted Maine law. But this would turn on its head the explicit language of the Settlement Acts giving Maine authority over land and water resources
 
 in the tribes’ territories.
 
 If there is “concurrent” jurisdiction at all, it is subordinate to Maine’s overriding authority to act within the scope of section 6204, which clearly includes Maine’s power to regulate discharge permitting consistent with the Clean Water Act.
 

 At the time the Settlement Acts were adopted, the Interior Department, largely responsible for relations with Indian tribes, told Congress that the southern tribes’ lands would generally be subject to Maine law. H.R. Rep. 96-1353 at 28 (report of the Department of the Interior).
 
 *44
 
 The Senate Report, adopted by the House Report, declared that “State law, including but not limited to laws regulating land use or management, conservation and environmental protection, are fully applicable as provided in [the proposed bill] and Section 6204 of the Maine Implementing Act.” S. Rep. 96-957 at 27; H.R. Rep. 96-1353 at 20.
 

 The Settlement Act contains an explicit statement that the southern tribes are to be treated as municipal corporations. 30 M.R.S.A. 6206(1). This status, not conferred on two other Maine tribes, is effectively a grant of local police powers. But in Maine (as elsewhere) municipal authority can be overridden by comprehensive state-wide law: home rule authority gives way in areas “preempted by comprehensive state-wide schemes.”
 
 Camden & Rockland Water Co. v. Town of Hope,
 
 543 A.2d 827, 830 (Me.1988). The state permitting scheme is just such a statute.
 

 There is
 
 one
 
 pertinent and explicit exception to the Settlement Act’s affirmations of state power, and our immediate task is to apply it to the present facts. The Maine implementing statute, ratified by Congress, says generally that the tribes have within their territories the rights and duties “of a municipality” (such as “to enact ordinances and collect taxes”) and are “subject to the laws of [Maine],
 

 provided, however, that
 
 internal tribal ■matters,
 
 including membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income
 
 shall not be subject to regulation by the State.”
 

 30 M.R.S.A. § 6206(1) (emphasis added).
 

 The tribes read the italicized phrase broadly, as encompassing discharges into navigable waters within tribal boundaries, even by the nineteen non-Indian facilities located outside those boundaries. Maine denies that the phrase applies even to the two tribal facilities that discharge into tribal waters. And the EPA adopts a middle ground, treating the discharges by the two tribal facilities as an “internal tribal matter” because—given the size of the discharge plumes—they have no “substantial effect [ ] on non-members.”
 

 The phrase “internal tribal matters,” taken wholly in the abstract, is assuredly vague. But the background rule is that Maine law on natural resources governs the tribes and their territories. Section 6204 says this explicitly and it is underscored by 25 U.S.C. § 1725(h), providing that “no law or regulation of the United States ... which affects or preempts the civil, criminal, or regulatory jurisdiction of the State of Maine, including, without limitation, laws of the State relating to land use or environmental matters, shall apply within the
 
 State.”
 

 [7]
 

 Then, in exempting internal affairs, the statute gives four statutory examples of internal affairs—tribal membership, residence in tribal territory, elections and use of settlement funds. These are not exclusive,
 
 Akins,
 
 130 F.3d at 486, but they are indicative of what the statute means by “internal tribal matters.”
 
 Penobscot Nation v. Stilphen,
 
 461 A.2d 478, 489 (Me.1983). In ordinary statutory construction,
 
 *45
 
 the proviso thus reserves to the tribe matters pertaining to tribal membership and governance structure, expenditure of fund income and
 
 other matters of the same kind, see United States v. McKelvey,
 
 203 F.3d 66, 71 (1st Cir.2000); but it does not displace general Maine law on most substantive subjects, including environmental regulation.
 

 This court has only two decisions directly construing the phrase “internal tribal matters” as applied to Maine tribes.
 
 Akins,
 
 130 F.3d 482;
 
 Penobscot Nation v. Fellencer,
 
 164 F.3d 706 (1st Cir.1999),
 
 cert. denied,
 
 527 U.S. 1022, 119 S.Ct. 2367, 144 L.Ed.2d 771 (1999). In the former, the right of a tribal member residing outside the territory to wood from Indian land was held not subject to due process and equal protection rules otherwise applicable to state action,
 
 Akins,
 
 130 F.3d at 483-84, 490; in the latter, we said that a dismissed employee of the tribal government could not sue under state law claiming discrimination.
 
 Fellencer,
 
 164 F.3d at 707.
 

 In both those cases, unlike this case, Maine disclaimed any interest in regulation or superintendence.
 
 Akins,
 
 130 F.3d at 488;
 
 Fellencer,
 
 164 F.3d at 710-11. By contrast, in the present case, Maine affirmatively asserts authority as to both tribal and non-tribal land to regulate discharges into navigable waters. The Settlement Act provisions just quoted affirm that power. If the internal affairs exemption negated so specific a ground of state authority, it is hard to see what would be left of the compromise restoration of Maine’s jurisdiction.
 

 Thus, we readily uphold the position of the EPA and Maine that the nineteen non-Indian discharge sources draining into tribal waters can be regulated by the state. The only real question is the EPA’s carve-out of the two source points that are on tribal lands and are owned by tribe entities; these do drain into navigable waters within what we assume to be tribal land. The EPA said that because the two sources have insignificant consequences for non-members, they
 
 are
 
 exempt from state regulation.
 

 If the EPA were construing the Clean Water Act, we would under
 
 Chevron,
 
 467 U.S. at 842-44, 104 S.Ct. 2778, owe deference to its coverage determination; but the Settlement Acts, which we treat as a matter of federal law, are not within its purview. So we accept the EPA’s factual premise as to the impact of the discharges
 
 [8]
 
 but not the EPA’s legal characterization. An Interior Department opinion letter to the EPA, although supporting the southern tribes’ claims as to
 
 all
 
 of the facilities, which is not independently authoritative,
 
 [9]
 
 appears to be in tension with Interior Department testimony given to Congress when the Settlement Acts were being considered.
 
 [10]
 

 
 *46
 
 In our view, the Settlement Acts make ordinary Maine law apply, even if only tribal members and tribal lands are affected in the particular case,
 
 unless
 
 the internal affairs exemption applies; and the scope of that exemption is determined by the character of the subject matter. Discharging pollutants into navigable waters is not of the same character as tribal elections, tribal membership or other exemplars that relate to the structure of Indian government or the distribution of tribal property.
 

 Fellencer
 
 and
 
 Akins
 
 have been read by the EPA to establish an open-ended balancing test by which every case is decided by an ad hoc weighing of tribal interests against Maine interests. 68 Fed.Reg. at 65,066. But these decisions involved issues arguably close to the (perhaps blurred) statutory borderline, and even there we said that the weighing of such considerations was only “one source of guidance.”
 
 Fellencer,
 
 164 F.3d at 709. Discharging pollutants into navigable waters is not a borderline case in which balancing,
 
 Akins,
 
 130 F.3d at 486-87, 488, or ambiguity canons,
 
 Fellencer,
 
 164 F.3d at 709, can alter the result.
 

 In addition to the internal affair’s exception, the southern tribes point to 25 U.S.C. § 1724(h), which reads:
 

 Land or natural resources acquired by the secretary in trust lor the [tribes] shall be managed and administered in accordance with terms established by the respective tribe or nation and agreed to by the Secretary in accordance with section 450f of this title, or other existing law.
 

 The tribes say that the phrase “shall be managed and administered” acknowledges their regulatory authority, concurrent with that of the Secretary, over their natural resources.
 

 This argument misreads section 1724(h). The basic jurisdictional allocation in the federal Settlement Act is contained in section 1725, which makes Maine law generally applicable to all of the Maine tribes and tribal lands save that, in the case of the southern tribes, the Maine Implementing Act controls by cross-references; and it, as already described, does no more than give those tribes municipal powers and reserves tribal authority over internal tribal matters. 25 U.S.C. § 1725(b)(1).
 

 Pertinently, the Senate Report said that section 1725(h) intended that even federal laws according special status or rights to tribes “would not apply within Maine if they conflict with the general civil, criminal, or regulatory laws” of Maine. S. Rep. 95-957 at 31. It noted that Maine law would trump a Clean Air Act provision providing tribes special rights, and it continued: “This would also be true of [Maine] police power laws on such matters as safety, public health, environmental regulations or land use.”
 
 Id.
 

 By contrast, section 1724(h) does not address Maine’s jurisdiction over tribes or tribal lands. Rather, 1724 as a whole is concerned with the creation and use of a large fund established for the tribes by the United States which, among other things, can be used for land purchases to be held in trust for the tribes. Under subsection (h), the “management and administration” of land and other natural resources so acquired by the Secretary’s interest or the tribe is subject to agreement between the tribe and the Secretary.
 

 
 *47
 
 Nothing in this administrative provision licenses the tribes to supersede either the Clean Water Act or Maine permitting law and regulate the discharge of pollutants into navigable waters. To read section 1724(h) as the tribes urge would effectively repeal section 1725, which (by itself and with its cross-reference to Maine law) was the core allocation of authority between the tribes and Maine. We need not mark out definitively the contours of section 1724(h) to be certain that it has no such meaning.
 

 As it happens, most of the land at issue in this case does not appear to have been “acquired by the secretary in trust” out of the fund proceeds. Rather, the facilities appear (even assuming the tribes’ boundary claims) to discharge onto reservation waters
 
 retained,
 
 by the tribes under the Settlement Act, based on earlier agreements between the tribes and Massachusetts and Maine.
 
 [11]
 
 That such lands may be subject to limitations on alienation does not make them lands acquired in trust for the tribes by the Secretary under section 1724(h).
 
 See
 
 H. Rep. 96-1353, at 15 (reservation lands not taken by the United States in trust).
 

 Even if these were lands acquired by the Secretary, this would not automatically negate Maine law. Section 1725(b)(1) provides that “the [tribes], and their members, and the land and natural resources owned by, or held in trust for the benefit of the tribe, nation, or their members, shall be subject to the jurisdiction of the State of Maine to the extent and in the manner provided in the Maine Implementing Act.” Similarly, 30 M.R.S.A. § 6204, provides for the application of Maine law to “any lands or other natural resources owned by [the tribes] [or] held in trust for them by the United States or by any other person or entity.”
 

 This brings us to a quite different issue. The EPA said that, as to the sites for which it ceded permitting authority to Maine, it still retained authority to review permits issued by Maine and that it could exercise its authority in light of a general trust relationship between the federal government and the tribes. 68 Fed.Reg. at 65,068. The EPA’s authority to review state permits is clear; what is disputed by Maine are the grounds
 
 on which the
 
 EPA could reject a state permit.
 

 The EPA concluded that, to carry out federal trust responsibilities to the tribes, it could use its authority to object to state-issued permits to protect the tribes’ right to “take fish ... for their individual sustenance,” 30 M.R.S.A. § 6207(4). Maine says that the EPA has no environmental trust responsibilities to the tribes. The tribes respond that Maine is prepared to sacrifice clean water relied on by the Indians.
 

 Our jui'isdiction to review the EPA’s actions under section 1342 depends “on the issuance or denial of a permit.”
 
 Rhode Island v. EPA,
 
 378 F.3d 19, 23 (1st Cir.2004); 33 U.S.C. § 1369(b)(1)(F). The EPA has not objected to any state permit; and the EPA’s decision stated that the agency “cannot now predict with any particularity how the CWA’s requirements will govern particular permitting or implementation issues as they arise under the [State’s] program.” 68 Fed.Reg. at 65,068. The trust issue is not ripe for consideration.
 
 Abbott Labs. v. Gardner,
 
 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681
 
 *48
 
 (1967);
 
 Stern v. U.S. Dist. Court for Dist. of Mass.,
 
 214 F.3d 4, 10 (1st Cir.2000).
 

 The EPA agrees that the trust issue is premature and no other party offers a cogent explanation of why questions relating to EPA review of future Maine permits are now ripe for review. The EPA was entitled to give warning as to its enforcement intentions; but that does not mean that the standards it proposes to employ are independently reviewable in advance.
 
 Cf. Abbott Labs., 387
 
 U.S. at 152, 87 S.Ct. 1507. And, where the issue is an amorphous “trust” responsibility and not specific standards, there is even more reason to avoid premature consideration.
 

 Our concern in this decision has been with Maine’s authority vis-a-vis the southern tribes and with the provisions of the Settlement Acts bearing on that relationship. The current relationship of the United States to those tribes, and the EPA’s continued authority under the Clean Water Act to review Maine’s exercise of ceded powers, present quite different questions. If Maine is wise in its exercise of its new authority, quite possibly these questions will not need to be resolved. In all events, we take no view today as to the ultimate resolution of these potential issues.
 

 Finally, we take note of an argument offered not by the tribes or by Maine but by intervenor municipalities and other entities that may be discharging into the waters at issue. The intervenors argue that by operation of law, Maine has
 
 already
 
 acquired permitting authority over all of the sites, including the two over which the EPA has disallowed state jurisdiction—disallowance that we are now setting aside.
 

 The intervenors’ argument is that state permitting authority came into effect when the EPA failed to reject Maine’s application within 90 days after its filing. Of course, the EPA and Maine agreed to a series of extensions and, after the last of these, the EPA ceased to issue permits of its own. 66 Fed.Reg. at 12,792. But, as the intervenors read the Clean Water Act, the failure affirmatively to disallow an application within the original statutory time limit not only bars new EPA permits but devolves authority to issue permits on the state.
 

 Since we have sustained state jurisdiction as to all of the sites, this statutory argument does not affect the ultimate outcome. Further, the EPA argues that the intervenors have no standing to make an argument that has been made neither by the EPA (in defense as to the nineteen sites) nor by Maine (as to the other two sites). The standing argument is, as is often the case, more complicated than the merits of the claim—partly because of conflict in the case law and partly because more than one standing concept is involved.
 
 [12]
 

 Regardless of intervenors’ standing, this court might well have an interest of its own in a
 
 sua sponle
 
 inquiry if we were being asked to proceed on a false legal premise as to the status of the EPA order under review. The premise, however, is not false. By its terms, the Clean Water Act cuts off EPA permitting authority after its deadline expires, 33 U.S.C. § 1342(c)(1); but the state can take over only after the affirmative findings required by the statute.
 
 Id.
 
 § 1342(b); 40 C.F.R. § 123.1(c).
 

 The EPA’s order insofar as it cedes permitting authority over the nineteen dis
 
 *49
 
 puted sites not in Indian territory is
 
 affirmed;
 
 as to the two disputed Indian-owned sites, the order is
 
 vacated
 
 and that aspect of the case remanded so that the order can be amended in accordance with this decision; and as to the EPA’s assertion of authority with respect to review of state permits, the matter is premature and we decline to decide it. All parties will bear them own costs on these consolidated petitions for review.
 

 It is so ordered.
 

 [1]
 

 . The Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1721-1735 ("MICSA”) and the Maine Implementing Act, 30 M.R.S.A. §§ 6201-6214 (“MIA”), collectively, "the Settlement Acts.”
 

 [2]
 

 . Strictly speaking, the approval governs point source discharges and certain industrial sources discharging to treatment plants but not cooling structures or certain sludge programs. 66 Fed.Reg. at 12,792. So far as the approval is effective, it would replace the EPA permit and two state permitting or certification regimes with a single consolidated state permit.
 

 [3]
 

 .
 
 See
 
 State Program Requirements, 68 Fed. Reg. 65,052 (Nov. 18, 2003). The territorial boundaries are disputed but, for purposes of this case, we assume (without deciding) that each of the disputed discharge points lies within the tribes’ territories.
 
 Id.
 
 at 65,054. The discharges from the facilities in question are into navigable waters of the United States, including the Penobscot, St. Croix and Pisca-tiquis Rivers.
 

 [4]
 

 . The jurisdiction-allocating provisions of the federal statute provide in similar terms that the “Passamaquoddy Tribe, the Penobscot Nation, and their members, and the land and natural resources owned by, or held in trust [for them] ... shall be subject to the jurisdiction of the State of Maine to the extent and in the manner provided in the Maine Implementing Act and that Act is hereby approved, ratified, and confirmed.” 25 U.S.C. § 1725(b)(1). “[L]and or natural resources” include “water and water rights.”
 
 Id.
 
 § 1722(b). Accord 30 M.R.S.A. § 6203(3).
 

 [5]
 

 . When in 1987 Congress empowered Indian tribes generally to apply for “treatment as state" status under the Clean Water Act, 33 U.S.C. § 1377(e), including permitting authority, the legislative history noted that "tribes addressed by the [federal] Settlement Act are" excluded. 133 Cong. Rec. H131 (Jan. 7, 1987);
 
 reprinted in
 
 1987 U.S.C.C.A.N. 5, 43.
 

 [6]
 

 .
 
 See
 
 25 U.S.C. § 1727(f) (child custody on a temporary basis); 30 M.R.S.A. § 6206(3) (violations of tribal ordinances by non-members);
 
 id.
 
 §§ 6209-A(l), 6209-B(l) (serious crimes).
 

 [7]
 

 . The Senate Report stated that “for example, although the federal Clean Air Act, 42 U.S.C. § 7474, accords special rights to Indian tribes and Indian lands, such rights will not apply in Maine because otherwise they would interfere with State air quality laws which will be applicable to the lands held by or (or the benefit of the Maine Tribes. This would also be true of police power laws on such matters as safety, public health, environmental regulation or land use.” S. Rep. 96-957 at 31.
 

 [8]
 

 . “EPA acknowledges there is the potential for an impact on non-members outside the Indian Territories. The Agency finds, however, that the discharges from these facilities are quite small, especially in relation to the total volume of the major water ways that receive the discharges. There is one tribal discharge permitted on each of two different reservations, so there is no cumulative effect from a cluster of tribal point sources. Therefore, the likely impact on downstream water quality is extremely limited." 68 Fed.Reg. at 65,065.
 

 [9]
 

 .
 
 Christensen v. Harris County,
 
 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (“[IJnterpretations contained in formats such as opinion tetters are 'entitled to respect' ... but only to the extent that those interpretations have the ‘power to persuade,' ” (citations omitted)).
 

 [10]
 

 .
 
 See, e.g.,
 
 the then Interior Secretary’s statement to Congress that the Settlement Acts were "intended to effectuate the broad assumption of jurisdiction over Indian land by the State of Maine,” H.R. Rep. 96-1353 at
 
 *46
 
 28,
 
 reprinted in
 
 1980 U.S.C.C.A.N. 3786, 3803-3804 (report of the Department of the Interior).
 

 [11]
 

 .
 
 See
 
 30 M.R.S.A. § 6203(5), (8) (defining reservation lands as those reserved to the tribes by agreement with Massachusetts and Maine and not subsequently transferred);
 
 id.
 
 § 6205 (defining the boundaries of Indian territory and clearly differentiating between reservation land and land acquired by the Secretary in trust).
 

 [12]
 

 .
 
 E.g., Mangual v. Rotger-Sabat,
 
 317 F.3d 45, 61 & n. 5 (1st Cir.2003) ("[T]he circuits are split on the question of whether standing is required to intervene if the original parties are still pursuing the case and thus maintaining a case or controversy.... ”).