# United States Court of Appeals
## For the First Circuit

Nos. 16-1424
     16-1435
     16-1474
     16-1482

PENOBSCOT NATION; UNITED STATES, on its own behalf,
and for the benefit of the Penobscot Nation,

Plaintiffs, Appellants, Cross-Appellees,

v.

JANET T. MILLS, Attorney General for the State of Maine;
CHANDLER WOODCOCK, Commissioner for the Maine Department of
Inland Fisheries and Wildlife; JOEL T. WILKINSON, Colonel for
the Maine Warden Service; STATE OF MAINE; TOWN OF HOWLAND; TRUE
TEXTILES, INC.; GUILFORD-SANGERVILLE SANITARY DISTRICT; CITY OF
BREWER; TOWN OF MILLINOCKET; KRUGER ENERGY (USA) INC.; VEAZIE
SEWER DISTRICT; TOWN OF MATTAWAMKEAG; COVANTA MAINE LLC; LINCOLN
SANITARY DISTRICT; TOWN OF EAST MILLINOCKET; TOWN OF LINCOLN;
VERSO PAPER CORPORATION,

Defendants, Appellees, Cross-Appellants,

EXPERA OLD TOWN; TOWN OF BUCKSPORT; LINCOLN PAPER AND TISSUE
LLC; GREAT NORTHERN PAPER COMPANY LLC,

Defendants, Appellees,

TOWN OF ORONO,

Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Selya, and Lynch,
<u>Circuit Judges</u>.

───────────────

        Kaighn Smith, Jr., with whom <u>James T. Kilbreth, III</u>, <u>David M. Kallin</u>, <u>Drummond Woodsum</u>, and <u>Mark A. Chavaree</u> were on brief, for appellant Penobscot Nation.
        <u>Mary Gabrielle Sprague</u>, Attorney, Environment and Natural Resources Division, U.S. Department of Justice, with whom <u>John C. Cruden</u>, Assistant Attorney General, <u>Bella Sewall Wolitz</u>, Office of the Solicitor, U.S. Department of the Interior, <u>Steven Miskinis</u>, Attorney, Environment and Natural Resources Division, U.S. Department of Justice, and <u>Elizabeth Ann Peterson</u>, Attorney, Environment and Natural Resources Division, U.S. Department of Justice, were on brief, for appellant United States.
        <u>Gerald D. Reid</u>, Assistant Attorney General, Chief, Natural Resources Division, with whom <u>Janet T. Mills</u>, Attorney General, <u>Kimberly L. Patwardhan</u>, Assistant Attorney General, <u>Susan P. Herman</u>, Deputy Attorney General, Chief, Litigation Division, and <u>Christopher C. Taub</u>, Assistant Attorney General, Senior Litigation Counsel, were on brief, for state defendants appellees.
        <u>Catherine R. Connors</u>, with whom <u>Matthew D. Manahan</u> and <u>Pierce Atwood LLP</u> were on brief, for state intervenors appellees.

───────────────

June 30, 2017

───────────────

**LYNCH**, **Circuit Judge**.    The Penobscot Nation (the "Nation") filed suit in federal court against the State of Maine and various state officials (the "State Defendants"), claiming rights as to a 60-mile stretch of the Penobscot River, commonly known as the "Main Stem."  The United States intervened in support of the Nation.  Private interests, towns, and other political entities, whom we shall call the "State Intervenors," intervened in support of the State Defendants' position.

The district court, on cross-motions for summary judgment, made two rulings: (1) "[T]he Penobscot Indian Reservation as defined in [the Maine Implementing Act ("MIA"), Me. Rev. Stat. Ann. tit. 30 ("30 M.R.S.A."),] § 6203(8) and [the Maine Indian Claims Settlement Act ("MICSA")], 25 U.S.C. § 1722(i), includes the islands of the Main Stem, but not the waters of the Main Stem," Penobscot Nation v. Mills, 151 F. Supp. 3d 181, 222 (D. Me. 2015); and (2) "[T]he sustenance fishing rights provided in . . . 30 M.R.S.A. § 6207(4) allows the Penobscot Nation to take fish for individual sustenance in the entirety of the Main Stem section of the Penobscot River," id. at 222-23.  The court issued declaratory relief to that effect on both points.  Id.

In these cross-appeals, we affirm the first ruling and hold that the plain text of the definition of "Penobscot Indian Reservation" in the MIA and the MICSA (together, the "Settlement Acts"), includes the specified islands in the Main Stem, but not

- 3 -

the Main Stem itself.  As to the second ruling on sustenance fishing, we vacate and order dismissal.  That claim is not ripe, and under these circumstances, the Nation lacks standing to pursue it.

Those interested in further details of this dispute will find them in the district court opinion.  See Penobscot Nation, 151 F. Supp. 3d at 185–212.  Given that the plain text of the statutes resolves the first issue and that there is no Article III jurisdiction as to the second, we do not and may not consider that history.  Instead, we get directly to the point on both issues.

## I.

This litigation began shortly after the Maine Warden Service and the Maine Department of Inland Fisheries and Wildlife requested a legal opinion from Maine's then-Attorney General William Schneider "regarding the respective regulatory jurisdictions of the . . . Nation and the State of Maine . . . relating to hunting and fishing on the [M]ain [S]tem of the Penobscot River."  Attorney General Schneider issued his opinion (the "Schneider Opinion" or "Opinion") on August 8, 2012.  On the same day, Attorney General Schneider sent a copy of the Opinion to the Governor of the Nation and noted in a cover letter: "I also understand that there have been several incidents in recent years in which . . . Nation representatives have confronted state employees, including game wardens, as well as members of [the]

- 4 -

public, on the River for the purpose of asserting jurisdiction over activities occurring on the River."

The Schneider Opinion states that "the . . . Nation may lawfully regulate hunting on, and restrict access to, the islands within the River from Medway to Old Town that comprise its Reservation, but may not regulate activities occurring on, nor restrict public access to, the River itself" and that "the State of Maine has exclusive regulatory jurisdiction over activities taking place on the River."

The Nation filed suit in federal court against the State Defendants on August 20, 2012. In its second amended complaint, the Nation sought a declaratory judgment that the Schneider Opinion misinterprets federal law -- namely, MISCA --and that both the Nation's regulatory authority and its sustenance fishing rights extend to and include the Main Stem of the Penobscot River. The State Defendants answered the Nation's complaint and filed counterclaims. The State Defendants sought a declaratory judgment that, among other things, "[t]he waters and bed of the [M]ain [S]tem of the Penobscot River are not within the Penobscot Nation reservation." All parties agree that the State Defendants' declaratory judgment claim on this point is ripe.

The United States, through the Department of Justice, filed a motion to intervene on behalf of the Nation on August 16, 2013, and the district court granted the United States intervenor

status on February 4, 2014.[1]  The State Intervenors filed their motion to intervene in support of the State Defendants on February 18, 2013, which the district court granted on June 18, 2013.  The parties engaged in discovery and further procedural sparring, after which the Nation, the State Defendants, and the United States each moved for summary judgment, and the State Intervenors moved for judgment on the pleadings.

The positions of the Nation and the United States differed slightly.  The Nation defined the term "Reservation" to include the entire Main Stem, bank-to-bank, and its submerged lands.  The United States said that that was its preferred reading, but it offered as another possible reading that the "Reservation" reaches the "thread" or centerline of the River.  This alternative reading would create "halos" around each of the Nation's islands, in which the Nation could engage in sustenance fishing.

---

[1]  The State Defendants objected to the United States' motion to intervene on the ground that it was barred by 25 U.S.C. § 1723(a)(2), and they continue that objection on appeal.
    The State Defendants filed an amended answer and counterclaims against the United States on November 3, 2014, asserting affirmative defenses that, among other things, the United States' complaint should be dismissed for failure to join indispensable parties and as barred by 25 U.S.C. § 1723(a)(2), and seeking declaratory relief along the lines of what they requested in their counterclaims against the Nation. Given our disposition, we do not reach these questions.

After oral argument, the district court issued its opinion.[2] The Nation and the United States then filed motions to amend the judgment, seeking to "clarify" that the Penobscot Indian Reservation includes submerged lands on each side of the Nation's islands to the thread of the Penobscot River, or alternatively "clarify" that the court had not decided the issue. The State Defendants opposed the motions, and the court summarily denied the motions.

These cross-appeals followed.

II.

We review orders granting summary judgment de novo. McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014). The parties agreed before the district court that the record was "amenable to resolution" by summary judgment, and the court agreed, concluding that it could "disregard as immaterial many factual disputes appearing in the record." Penobscot Nation, 151 F. Supp. 3d at 185 & n.4. All of the issues here are ones of law, which we review

---

[2] On the same day that it issued its opinion, the court, in a separate order, granted in part and denied in part the State Intervenors' motion for judgment on the pleadings for the same reasons and also granted in part and denied in part the State Intervenors' motion to exclude expert testimony submitted by the plaintiffs. The expert testimony ruling is not at issue in this appeal.

de novo. Franceschi v. U.S. Dep't of Veterans Affairs, 514 F.3d 81, 84-85 (1st Cir. 2008).

A.    Construction of 30 M.R.S.A. § 6203(8)

Section 6203(8) of the MIA, which sets out what "Penobscot Indian Reservation" "means" under the MIA, in turn controls what "Penobscot Indian Reservation" "means" for federal law purposes, 25 U.S.C. § 1722(i) ("'Penobscot Indian Reservation' means those lands as defined in the [the MIA]."). "As a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated." Burgess v. United States, 553 U.S. 124, 130 (2008) (alterations in original) (quoting Colautti v. Franklin, 439 U.S. 379, 392-93 n.10 (1979)).

The interpretation of section 6203(8) presents a question of statutory construction. We apply traditional rules of statutory construction to the Settlement Acts. See Maine v. Johnson, 498 F.3d 37, 41-47 (1st Cir. 2007); Aroostook Band of Micmacs v. Ryan, 484 F.3d 41, 50, 56 (1st Cir. 2007). The canon construing statutory ambiguities in favor of Indian tribes does not apply when the statutory language is unambiguous. South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 506 (1986); see also, e.g., Carcieri v. Salazar, 555 U.S. 379, 387 (2009)

(holding that where the language of the Indian Reorganization Act is unambiguous, the court must enforce its plain meaning).[3]

"As in any statutory construction case, '[w]e start, of course, with the statutory text . . . .'" Sebelius v. Cloer, 133 S. Ct. 1886, 1893 (2013) (alteration in original) (quoting BP Am. Prod. Co. v. Burton, 549 U.S. 84, 91 (2006)). The MIA states that

> "Penobscot Indian Reservation" means the islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine consisting solely of Indian Island, also known as Old Town Island, and all islands in that river northward thereof that existed on June 29, 1818, excepting any island transferred to a person or entity other than a member of the Penobscot Nation subsequent to June 29, 1818, and prior to the effective date of this Act.

30 M.R.S.A. § 6203(8). Where the meaning of the statutory text is plain and works no absurd result, the plain meaning controls. See Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) ("It is well

---

[3] We reject the plaintiffs' and dissent's argument that we must apply the Indian canon of construction resolving ambiguities in favor of Indian tribes. In fact, it would be an error of law to apply the canon here, under Catawaba Indian Tribe. 476 U.S. at 506 ("The canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress."). Because the plain meaning of the Settlement Acts resolves the question of the scope of the Reservation, there are no ambiguities to resolve in favor of the Nation. Carcieri, 555 U.S. at 387.
The reference to the canon in Penobscot Nation v. Fellencer, 164 F.3d 706, 709 (1st Cir. 1999), noted by the dissent, does not apply here. That case concerned whether a decision by the Nation's Tribal Council to terminate a community health nurse's employment was an "internal tribal matter" within the meaning of the Settlement Acts. Id. at 707. Whatever ambiguities may have been presented by that question, there are none here, and so the canon cannot apply.

established that 'when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms.'" (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000))). Such is the case here.[4]

The analysis turns on what "the islands in the Penobscot River" means. "Island" is not given a special definition in the MIA, and so we "construe [it] in accordance with its ordinary or natural meaning." FDIC v. Meyer, 510 U.S. 471, 476 (1994).[5] In its ordinary use, "island" refers to a piece of land that is completely surrounded by water. See, e.g., Island, Oxford English Dictionary Online, http://www.oed.com/view/Entry/99986 (last visited June 20, 2017) (first definition) ("A piece of land completely surrounded by water."); Island, Merriam-Webster's Dictionary Online, https://www.merriam-webster.com/dictionary /island (last visited June 20, 2017) (first definition) ("[A] tract

---

[4]     We do not reach the defendants' argument that the terms of the MICSA itself, in 25 U.S.C. §§ 1725(h) and 1735(b), bar the application of the Indian canons of construction to the MIA. And we do not reach the defendants' argument that any ambiguities in the Settlement Acts should be construed with a presumption against finding that a state has conveyed its navigable waters.

[5]     Because we find that the plain meaning of section 6203(8) resolves the issue of the meaning of the "Reservation," we do not reach several of the defendants' alternative arguments that the Main Stem has been "transfer[red]" from the Nation to Maine under the Settlement Acts, see 25 U.S.C. §§ 1722(b),(n), 1723; 30 M.R.S.A. §§ 6203(13), 6213, and that the doctrines of laches, acquiescence, and impossibility bar the Nation's claims.

- 10 -

of land surrounded by water and smaller than a continent[.]");

Island, Dictionary.com, http://www.dictionary.com/browse/island

(last visited June 20, 2017) (first definition) ("[A] tract of

land completely surrounded by water, and not large enough to be

called a continent.").[6]  Its ordinary meaning is clear and

---

[6]    The dissent argues that if "island" is to be understood
in terms of "land," then we should look to dictionary definitions
of "land" that the dissent claims include water.  What the dissent
does not reveal is that the primary definitions of "land" in all
the sources it cites exclude water.  The only definitions arguably
helpful to the dissent are subordinate to these primary
definitions.      See   Land,   Webster's   1913   Dictionary,
http://www.webster-dictionary.org/definition/land  (last  visited
June 19, 2017) (listing as first definition "[t]he solid part of
the surface of the earth; - opposed to water as constituting a
part of such surface, especially to oceans and seas; as, to sight
land after a long voyage," and listing the definition offered by
the      dissent      eighth);      Wordreference.com,      Land,
http://www.wordreference.com/definition/land  (last  visited  June
19, 2017) (listing as first definition "any part of the earth's
surface, as a continent or an island, not covered by a body of
water," and listing the definitions arguably most helpful to the
dissent -- "an area of ground with specific boundaries" and "any
part of the earth's surface that can be owned as property, and
everything connected to it" -- third and fifth, respectively);
Dictionary.com, Land, http://www.dictionary.com/browse/land (last
visited June 19, 2017) (listing as first definition "any part of
the earth's surface not covered by a body of water; the part of
the earth's surface occupied by continents and islands," and
listing the definition arguably most helpful to the dissent --
"any part of the earth's surface that can be owned as property,
and everything annexed to it, whether by nature or by the human
hand" -- fifth).

     We do not, as the dissent suggests, contend that a
subordinate definition can never supply the operative meaning of
a term.  But as a general rule, a term's "most common[,] . . .
ordinary and natural" meaning controls, Mallard v. U.S. Dist. Court
for S. Dist. of Iowa, 490 U.S. 296, 301 (1989), and "[a]ny
definition of a word that is absent from many dictionaries" or
consistently subordinate where included is "hardly a common or
ordinary meaning," Taniguchi v. Kan Pac. Saipan, Ltd., 132 S. Ct.

unambiguous.  See also Carcieri, 555 U.S. at 388-90 (interpreting the use of "now" in 25 U.S.C. § 479 through its ordinary meaning and use in the statute, and finding the term unambiguous).

To add emphasis to the limits of this definitional term, the statute further states that the Reservation "islands" "consist[] solely" of the enumerated islands.  30 M.R.S.A. § 6203(8) (emphasis added).  "'Solely' leaves no leeway." Helvering v. Sw. Consol. Corp., 315 U.S. 194, 198 (1942).

Our holding that the term "island" does not refer to the surrounding water itself or to the land submerged by the surrounding water is also compelled by other text within the Settlement Acts.  See, e.g., Henson v. Santander Consumer USA Inc., No. 16-349, 2017 WL 2507342, at *4 (U.S. June 12, 2017) (confirming plain meaning reading by "[l]ooking to other neighboring provisions in the [statute]").  When the Settlement Acts mean to address the various topics of water, water rights, or submerged land, they do so explicitly and use different language.  See, e.g., 25 U.S.C. § 1721(b)(2) ("It is the purpose of this subchapter . . . to clarify the status of . . . natural resources in the State of Maine."); id. § 1722(b) (defining the phrase "land or natural

_____

1997, 2003 (2012).  It is clear what the ordinary meaning of "land" is from the fact that all of the dictionaries cited above define it primarily as excluding water, while none ranks a definition inclusive of water higher than third.  See id.  "Were the meaning of ['land'] that [the dissent] advocates truly common or ordinary, we would expect to see more support for that meaning."  Id.

- 12 -

resources" in the MICSA as "any real property or natural resources . . . including . . . water and water rights"); 30 M.R.S.A. § 6203(3) (defining the phrase "land or other natural resources" in the MIA as "any real property or other natural resources . . . including . . . water and water rights"); 25 U.S.C. § 1722(n) and 30 M.R.S.A. § 6203(13) (including "natural resources" as things that can be "transferred" as that word is used in the Settlement Acts); 30 M.R.S.A. § 6207 (discussing regulation of "waters"); id. § 6207(1)(B) (addressing regulation of "[t]aking of fish on any pond in which all the shoreline and all submerged lands are wholly within Indian territory," and using the term "territory" rather than "Reservation" (emphasis added)).

Further, section 6205(3)(A), which deals with purchases of land to compensate for regulatory takings within Indian reservations, states that "[f]or purposes of this section, land along and adjacent to the Penobscot River shall be deemed to be contiguous to the Penobscot Indian Reservation," thus implying that otherwise the "Reservation" is not contiguous to land along and adjacent to the Penobscot River. 30 M.R.S.A. § 6205(3)(A). The Nation's and United States' construction of "Penobscot Indian Reservation" would render that language superfluous, a result forbidden by the canons of construction. See In re Montreal, Me. & Atl. Ry., Ltd., 799 F.3d 1, 9 (1st Cir. 2015) ("[C]ourts should

- 13 -

construe statutes to avoid rendering superfluous any words or phrases therein.").

The MICSA's definitional provision for "Penobscot Indian Reservation" itself reinforces this plain-meaning reading of the MIA. Section 1722(i) of the MICSA provides that "'Penobscot Indian Reservation' means those lands as defined in [the MIA]." 25 U.S.C. 1722(i) (emphasis added). In its ordinary meaning, the unadorned term "land" does not mean water. It means land, as distinct from water.[7] The MICSA does not say waters are included within the boundaries of the "Penobscot Indian Reservation." Taken together, the Settlement Acts unambiguously define "Penobscot Indian Reservation" as specified islands in the Main Stem of the Penobscot River, and not the Main Stem itself or any portion of the Main Stem. The plain meaning of "islands in the Penobscot River" is

_____

[7] See, e.g., Land, Oxford English Dictionary Online, http://www.oed.com/view/Entry/105432 (last visited June 20, 2017) (first definition) ("The solid portion of the earth's surface, as opposed to sea, water."); Land, Merriam-Webster's Dictionary Online, https://www.merriam-webster.com/dictionary/land (last visited June 20, 2017) (first definition) ("[T]he solid part of the surface of the earth[.]"); Land, Dictionary.com, http://www.dictionary.com/browse/land (last visited June 20, 2017) (first definition) ("[A]ny part of the earth's surface not covered by a body of water; the part of the earth's surface occupied by continents and islands.").

As we have shown at note 6, supra, the dissent's attempt to argue that "land" includes water by reference to subordinate definitions of "land" from dictionaries that primarily define "land" as excluding water is unconvincing. The ordinary meaning of land, as even the sources cited by the dissent make clear, obviously excludes water.

- 14 -

the islands <u>in</u> the River, not the islands <u>and</u> the River or the riverbed.

The Nation and the United States agree that a plain-meaning reading must control. They offer a different reading of what that plain meaning is. They argue that the definition of "Penobscot Indian Reservation" in section 6203(8) is modified by section 6207(4)'s grant of sustenance fishing rights to the Nation "within the boundaries of [the Nation's] Indian reservation[]." 30 M.R.S.A. § 6207(4).[8] They contend that because section 6207(4) was meant to protect the Nation's sustenance fishing rights in the Penobscot River, a reading of section 6203(8) based on the otherwise plain meaning of the term "islands" must be rejected because it would lead to the absurd result of nullifying section 6207(4).

Not so. The two provisions -- sections 6203(8) and 6207(4) -- are not in tension. The Nation's and United States' argument selectively omits relevant text and also ignores the differences in text between the two sections. Section 6203 itself specifically articulates that definitions in its subsections do

---

[8]    The Nation also makes similar contentions based on section 6207's provisions for sustenance hunting and trapping and "related authorities." These arguments are even less persuasive than those based on section 6207(4), as the provisions of section 6207 at issue reference the Nation's "territor[y]," a distinct term encompassing both the Reservation and over 130,000 acres of trust lands acquired by the United States on behalf of the Nation. <u>See</u> 30 M.R.S.A. §§ 6205(2), 6207(1).

not apply when "the context indicates otherwise," 30 M.R.S.A. § 6203, which governs section 6207(4).  This clause avoids any supposed conflict between section 6203(8) and section 6207(4) through the statute's own provisions.  There is no need to distort the plain meaning of "islands" in section 6203(8).

Also, the sustenance fishing provision refers to "Indian reservations," not just the "Penobscot Indian Reservation," as it applies "within the boundaries" of both the Passamaquoddy Tribe's and the Nation's respective reservations.  Id. § 6207(4).  If the term "island" in section 6203(8) was meant to include all or any portion of the surrounding waters, the text would have said so. As Justice Scalia observed in a Chevron case, see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984), legislatures do not "hide elephants in mouseholes."  Whitman v. Am. Trucking Ass'ns, Inc., 531 U.S. 457, 468 (2001).  The ancillary reference to "Indian reservations" referring to both the Passamaquoddy Tribe and the Nation in section 6207(4) cannot dramatically alter the plain meaning of section 6203(8)'s definition of "Penobscot Indian Reservation."

The Nation and the United States also point to the reference to previous "agreement[s]" in section 6203(8): "the islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine consisting solely of Indian Island . . . and all islands in that river

northward thereof that existed on June 29, 1818, excepting any island transferred [after] June 29, 1818." 30 M.R.S.A. § 6203(8). They argue that the reference to the previous treaties found in the "by agreement" clause means that the definition of "Penobscot Indian Reservation" incorporates the Nation's understanding of the treaties and state common law. Again, not so. The reference to the treaties is merely language specifying which "islands" are involved, not language modifying the meaning of "islands." The treaties no longer have meaning independent of the Maine Settlement Acts. Rather, upon the passage of the Acts, the treaties were subsumed within the Acts, and we look only to the statutory text to understand the reservation's boundaries.

The Nation and the United States further argue that, regardless of text, the district court's reading of section 6203(8) must be incorrect because it contradicts the Supreme Court's holding in Alaska Pacific Fisheries v. United States, 248 U.S. 78 (1918). It does not. Alaska Pacific concerned the interpretation of a distinct phrase, "the body of lands known as Annette Islands, situated in Alexander Archipelago in Southeastern Alaska," in an unrelated congressional statute that was enacted in 1891 before Alaska became a state. Id. at 86 (quoting Act of March 3, 1891, ch. 561, § 15, 26 Stat. 1095, 1101). The Court considered not only the statute's plain text but also the legislative history of the statute and the "general rule that statutes passed for the benefit

of dependent Indian tribes . . . are to be liberally construed, doubtful expression resolved in favor of the Indians." Id. at 78. In light of those considerations, the Court held that Congress "did not reserve merely the site of [the Metlakahtlans'] village, or the island on which they were dwelling, but the whole of what is known as Annette Islands, and referred to it as a single body of lands." Id. at 89.

Alaska Pacific's holding does not affect the question before us. Despite the superficial similarities between the definition of the Penobscot reservation and the statute at issue in Alaska Pacific, they differ materially. The Alaska Pacific Court found it "important," if not "essential," to consider "the circumstances in which the reservation was created." Id. at 87. Not so here: the definition of the Penobscot reservation lacks any comparable ambiguity, and any resort to "the circumstances in which the reservation was created" would be neither important nor essential but, rather, wholly unnecessary. The definition of the Penobscot Indian Reservation specifies that it consists "solely of Indian Island . . . and all islands in that river." 30 M.R.S.A. § 6203(8) (emphasis added). The definition in Alaska Pacific has no limiting term comparable to the adverb "solely." Moreover, the definition of the Penobscot reservation refers only to "islands in the Penobscot River" and "islands in that river." Id. (emphases added). As discussed above, this forms a clear distinction between

uplands and the river itself. In contrast, the definition in Alaska Pacific uses a much vaguer phrase: "the body of lands known as Annette Islands, situated in Alexander Archipelago." 248 U.S. at 86. Unlike the Alaska Pacific Court, we have no need to consider legislative history or the Indian canons of construction, see supra note 3, because the plain text of the definition of the Penobscot reservation is unambiguous.[9]

We are forbidden by law from varying from the plain text based on arguments made as to the nature of the Agreement reached. We do not look to either side's understanding of the Agreement when the meaning of the text of the Settlement Acts is plain.[10] See Star Athletica, L.L.C. v. Varsity Brands, Inc., 137 S. Ct.

---

[9]    Hynes v. Grimes Packing Co., 337 U.S. 86 (1949), and Choctaw Nation v. Oklahoma, 397 U.S. 620 (1970), cited by the dissent as applying Alaska Pacific, are inapposite for the same reasons. Those cases also interpreted materially distinct language in enactments unrelated to the Settlement Acts.

[10]    We reject the position of the United States that we should not use normal canons of statutory construction and should instead use Maine's state law rules for the construction of deeds. We are not construing a deed.
   We also reject the United States' arguments more generally that state common law informs the definition of Reservation. Nothing in the text of the Settlement Acts permits the use of state common law to construe the statutes' definitional provisions. The meaning of Reservation in the Settlement Acts is plain, and we cannot use state common law to alter that plain meaning.
   Finally, we reject the United States' argument that the Settlement Acts grant to the Nation "halos" of riparian rights around each island. Nothing in the plain language of the statutes supports this position.

- 19 -

1002, 1010 (2017) ("The controlling principle in this case is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written." (quoting Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992))); Puerto Rico v. Franklin Cal. Tax-Free Tr., 136 S. Ct. 1938, 1946 (2016) (question of statutory interpretation "begins 'with the language of the statute itself,' and that 'is also where the inquiry should end,' for 'the statute's language is plain'" (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989))).

The Nation's and United States' arguments from history and each party's intent would be relevant only if the statutory language were ambiguous. See Matal v. Tam, No. 15-1293, 2017 WL 2621315, at *10 (U.S. June 19, 2017) ("These arguments are unpersuasive. As always, our inquiry into the meaning of the statute's text ceases when 'the statutory language is unambiguous and the statutory scheme is coherent and consistent.'" (quoting Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002))); Milner v. Dep't of the Navy, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text. We will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language."). The language is not ambiguous.

The district court was correct to hold that the Settlement Acts mean what they plainly say. The Penobscot Indian Reservation consists of the specified "islands in" the Main Stem of the Penobscot River. It does not include the Main Stem itself, any portion thereof, or the submerged lands underneath.

As to the dissent's three reasons to reach the opposite conclusion, as explained, the Alaska Pacific opinion does not provide the rule for decision because it concerned an entirely different provision in a different statute. The dissent departs from the Supreme Court's mandate that courts must interpret statutes according to their plain text. See Tam, 2017 WL 2621315, at *10 (noting that a party's "argument is refuted by the plain terms of the [statute]"); Henson, 2017 WL 2507342, at *6 ("And while it is of course our job to apply faithfully the law Congress has written, it is never our job to rewrite a constitutionally valid statutory text under the banner of speculation about [congressional intent]."); Star Athletica, LLC, 137 S. Ct. at 1010 ("We . . . begin and end our inquiry with the text . . . ."); Samsung Elecs. Co. v. Apple Inc., 137 S. Ct. 429, 434 (2016) ("The text resolves this case."). Second, the statute is clear that the role of the treaties is simply to define which "islands" are included in the Reservation, not to alter the plain meaning of the term Reservation itself.

Third, the question of the definition of Reservation is not the same as the unripe question of sustenance fishing. The MIA itself provides for how to resolve tensions between the definition of Reservation and the use of that term in the sustenance fishing provision.

Maine v. Johnson, 498 F.3d 37 (1st Cir. 2007), cited heavily by the dissent, concerned an entirely different issue and did not present the issue of the meaning of Penobscot Indian Reservation in the Settlement Acts. Footnote 11 of Johnson, which the dissent suggests controls this case, merely distinguishes between Reservation lands and land later acquired in trust. Id. at 47 n.11. It is simply not true that this court has held in Johnson that the definition of Reservation embraced the waters of the Penobscot River. Johnson addressed a distinct question and, in doing so, explicitly bypassed any territorial dispute that might have been implicated by that question. See id. at 40 n.3 ("The territorial boundaries are disputed but, for purposes of this case, we assume (without deciding) that each of the disputed . . . points lies within the tribes' territories."); see also id. at 47. It has no bearing on the precise boundaries of the Nation's Reservation as that term is used in the Settlement Acts.

Moreover, while the Nation and the United States referred glancingly in their briefing to footnote 11 in Johnson, they did not argue that the issue presented in this case was

- 22 -

already decided by Johnson.  The dissent has made this argument
for them.[11]  The dissent's version of history does not illuminate
the plain meaning of the text and is impermissible to consider.[12]

We affirm the entry of declaratory judgment for the
defendants on this point.

B.    Sustenance Fishing Rights

We hold that the federal courts lack jurisdiction in the
circumstances of this case to adjudicate the question of the
Nation's sustenance fishing rights.  The district court erred in
reaching this issue because the issue is not ripe and the
plaintiffs presently lack standing.  As a result, we vacate the
district court's ruling on this issue, without adjudicating the

_____

[11]    The dissent, but not the United States or the Nation,
argues that Maine -- in its briefing in Johnson -- has been
inconsistent as to whether the term "islands" includes waters.
Maine has had no notice of this argument or an opportunity to
respond.  Further, we see no necessary contradiction, especially
since the issue here was not at issue in Johnson.
        Similarly, as to the 1988 letter from the Maine Attorney
General, the question was whether Maine law prohibited the use of
gill nets to take about 20 Atlantic salmon, for the sole use of
tribal members for their individual consumption, and not to be
sold or processed for sale.  The Attorney General's answer was
there was no prohibition, under section 6207(4) of the MIA (the
sustenance fishing clause).  The Attorney General did not purport
to address whether any portion of the River was a part of the
Reservation.  Me. Op. Atty. Gen. No. 13 88-2 (Me. A.G.), 1988 WL
483316.

[12]    Similarly, the dissent invokes an argument regarding the
views expressed in a report commissioned by the Maine Indian
Tribal-State Commission.  We do not read that report as the dissent
does and, in any event, the Commission's views do not displace the
rules of construction courts must follow.

- 23 -

merits of the sustenance fishing issue, and order dismissal of this claim for relief.

The Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. Two "interrelated" "manifestations" of that limitation "are the justiciability doctrines of standing and ripeness." Reddy v. Foster, 845 F.3d 493, 499, 505 (1st Cir. 2017) (affirming dismissal of challenge to never-implemented statute). The plaintiffs cannot satisfy either doctrine as to the sustenance fishing issue.

The standing doctrine requires, inter alia, that a plaintiff show an "injury in fact," which is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)).

The Nation alleges that the Schneider Opinion poses a "threat" to its sustenance fishing rights. We see no such threat. Allegations of future injury confer standing only "under circumstances that render the threatened enforcement sufficiently imminent." Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2342 (2014). That test is not met.

The Schneider Opinion does not confer standing on the Nation now to obtain relief as to the sustenance fishing issue. The Opinion itself does not address or even mention the scope of

- 24 -

the Nation's fishing rights.  Nothing about the Opinion evidences that Maine threatens an injury -- imminent or otherwise -- to the Nation's sustenance fishing activities.  See Blum v. Holder, 744 F.3d 790, 792 (1st Cir. 2014) (holding that animal rights activists lacked standing to challenge the Animal Enterprise Terrorism Act where they had not been prosecuted or threatened with prosecution under the statute).

On the contrary, Maine has affirmatively represented that it has a "longstanding, informal policy" not to "interfere[] with [Nation] members engaged in sustenance fishing on the Maine Stem."  In Reddy, where we held there was neither standing nor ripeness, we found that the challenged unimplemented legislation did not presently interfere with the plaintiffs' relevant activities and that the government had "affirmatively disavowed prosecution . . . unless and until" certain absent preconditions were met.  845 F.3d at 502; see also Blum, 744 F.3d at 798 ("Particular weight must be given to the Government disavowal of any intention to prosecute . . . .").  The Nation's claims that the Schneider Opinion presently threatens the Tribe's "exclusive sovereign authority to govern [sustenance fishing]" or "tribal self-government" have no support in the record.

Nor can the Nation generate standing or ripeness by its own actions.  The Nation points to an Internet "alert" from a Nation official to Nation members stating that they are "at risk

- 25 -

of prosecution by Maine law enforcement officers" if they practice sustenance fishing in the Main Stem. The State of Maine has said no such thing.

These kinds of general and hypothetical allegations of injury cannot succeed at the summary judgment stage, where the plaintiffs must do more than merely allege legal injury and must instead provide a factual basis for the alleged injury. See Lujan, 504 U.S. at 561. The Nation and the United States have not even attempted to show that any member of the Nation has suffered any injury related to sustenance fishing practices in response to the Schneider Opinion. See Reddy, 845 F.3d at 503 (rejecting "conjectural fear" as sufficient for standing); see also Wittman v. Personhuballah, 136 S. Ct. 1732, 1737 (2016) ("When challenged by a court (or by an opposing party) concerned about standing, the party invoking the court's jurisdiction cannot simply allege a nonobvious harm, without more.").

The Nation and the United States also attempt to create standing by arguing that the State Defendants' own counterclaims in this lawsuit "necessarily place in controversy the location of the Penobscot Nation's sustenance fishery." The counterclaims do not do so. The State Defendants' counterclaims referenced allegations from Maine officials and recreational users of the Main Stem that the Nation had attempted to assert exclusive control over the Main Stem by, inter alia, demanding payment for access

permits.  While this may establish standing as to the issue about the meaning of "Penobscot Indian Reservation" (for which standing has not been contested), it does not go to the issue of sustenance fishing rights.  The allegations do not show there has been any injury to the Nation's sustenance fishing activities.  The plaintiffs cannot bootstrap the justiciability of their own claims by use of the State Defendants' counterclaims.  Cf. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press.").

The sustenance fishing claim is also not ripe. Plaintiffs must show both "fitness" and "hardship" to satisfy the ripeness analysis.  Reddy, 845 F.3d at 501.  The fitness prong asks "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all," Town of Barnstable v. O'Connor, 786 F.3d 130, 143 (1st Cir. 2015) (quoting Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 536 (1st Cir. 1995)), and the hardship prong "concerns the harm to the parties seeking relief that would come to those parties from our 'withholding of a decision' at this time," Reddy, 845 F.3d at 501 (quoting Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 330 (1st Cir. 2016)).

Both prongs of the ripeness analysis prevent justiciability here.  The sustenance fishing claim on this record is merely speculative.  There is no evidence in this record that

Maine has interfered with or threatened to interfere with the Nation's sustenance fishing in the Main Stem, and there is not even an allegation that the State plans to change its informal policy of not interfering with sustenance fishing. We have no concrete dispute before us and so have no facts to frame the appropriate inquiry, or even any relief. See Reddy, 845 F.3d at 497.

As to hardship, "there is no apparent prejudice to the plaintiffs if they must wait until their claims ripen to sue," because "[t]hey are 'not required to engage in, or to refrain from, any conduct, unless and until'" Maine actually takes some step to interfere with or at least officially proposes to interfere with sustenance fishing in the Main Stem. Id. at 505 (quoting Texas v. United States, 523 U.S. 296, 301 (1998)). The claim is not ripe for adjudication and the district court lacked jurisdiction to review it.[13]

### III.

The judgment of the district court is affirmed as to the declaratory judgment regarding the definition of "Penobscot Indian Reservation" under 30 M.R.S.A. § 6203(8) and 25 U.S.C. § 1722(i), and vacated with instructions to dismiss for want of jurisdiction

---

[13] In response to the defendants' ripeness arguments, Penobscot Nation cites case law on the requirements for the Ex Parte Young exception to the Eleventh Amendment. These citations are inapposite and add nothing to the ripeness analysis.

as to the declaratory judgment regarding the sustenance fishing rights under 30 M.R.S.A. § 6207(4). No costs are awarded.

**-Dissenting Opinion Follows-**

**TORRUELLA**, <u>**Circuit Judge**</u> **(dissenting).**  "Everything in US history is about the land—[including] who . . . fished its waters . . . ."[14]  This statement is particularly relevant in the dealings by the U.S. majority with the indigenous Indian population, and lies at the heart of the present appeal.  Although the United States has ratified over 370 treaties with Indian nations[15] -- it unfortunately "has a long and appalling history of breaking treaties with Indian nations whenever it was convenient . . . to do so."[16]  In the present case, the United States is on the right side of history and the law, but regrettably the same cannot be said of the State of Maine and its co-parties.

As will be presently detailed, the Reservation of the Penobscot Indian Nation includes the Main Stem of the Penobscot River, bank-to-bank, for three principal reasons.[17]  First, the Supreme Court has held that a grant of "lands" and "islands" to Indians includes "submerged lands"[18] and "surrounding waters,"

---

[14]  Roxanne Dunbar-Ortiz, An Indigenous Peoples' History of the United States 1, (2014).

[15]  The interested reader may find a complete database of these treaties at: http://digital.library.okstate.edu/kappler/vol2/ tocy1.htm.

[16]  Singer, Joseph, Legal Theory: Sovereignty and Property, 86 Nw. U.L. Rev. 1, 2 (1991).

[17]  For the sake of clarity, I here refer to the Penobscot Indian Nation as the "Nation" or the "Penobscots"; to its reservation as the "Reservation"; and to the "the Main Stem of the Penobscot River, bank-to-bank," as "the Main Stem."

[18]  As a matter of both Maine and Massachusetts law, the river

_Alaska Pacific Fisheries_ v. _United States_, 248 U.S. 78, 87-89 (1918). See _infra_ Section II. Second, the Settlement Acts reserve to the Nation what it retained in its treaties with Massachusetts and Maine, see 30 M.R.S.A. § 6203(8) -- including the Main Stem. See _infra_ Section III. Third, in a carefully negotiated key provision, the Settlement Acts provide for the Penobscot Nation to have the right to fish _within_ its Reservation, 30 M.R.S.A. § 6207(4) -- yet if the majority view prevails, the Nation's "fishing" will only take place in the uplands of their islands, on dry land where there are no fish and no places to fish. See _infra_ Section IV. These three reasons render the definition of the Reservation in the Settlement Acts ambiguous to say the least, and are therefore individually and collectively bolstered by the Indian canon of construction, "a principle deeply rooted in this Court's Indian jurisprudence [whereby] 'Statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'"[19] This clearly defeats the majority's dictionary-driven conclusion to the contrary.

---

bed of the Penobscot River is submerged land, and, because that river is non-tidal, this submerged land is not owned by the state, but rather privately owned. See _infra_ Section III.

[19] _Cty. of Yakima_ v. _Confederated Tribes & Bands of Yakima Indian Nation_, 502 U.S. 251, 269 (1992) (quoting _Montana_ v. _Blackfeet Tribe_, 471 U.S. 759, 766 (1985)).

The majority opinion "doth protest too much"[20] that the Settlement Acts define the Reservation unambiguously, and that considerations such as history and purpose are therefore irrelevant. Not only is the statute equivocal for the three reasons just stated, but as this court has cogently ruled

> [although] [t]he usual maxim is that courts do not go beyond the text of the statute if the meaning is plain. . . . [T]hat maxim has inherent flexibility. Even seemingly straightforward text should be informed by the purpose and context of the statute. Both this court and the Supreme Court have checked a sense of a statute's plain meaning against undisputed legislative history as a guard against judicial error.

Greebel v. FTP Software, Inc., 194 F.3d 185, 192 (1st Cir. 1999) (Lynch, J.) (emphasis added). Yet the majority ignores this precedent and -- elevating the dictionary above the law -- bypasses the Supreme Court's warning (made in the context of Indian law) that "one may not fully comprehend the statute's scope by extracting from it a single phrase, such as 'public lands' and getting the phrase's meaning from the dictionary," Hynes v. Grimes Packing Co., 337 U.S. 86, 115-16 (1949).[21]

---

[20] William Shakespeare, Hamlet act 3, sc. 2 137 (T.J.B. Spencer Ed., Penguin Books 1996) (1603).

[21] Even if the majority were correct to rely solely on dictionaries here -- and it is not -- its methodology is fallacious. The majority acknowledges that dictionaries offer multiple definitions of "land," but asserts that the definition listed first must govern, and that it unambiguously establishes the meaning of "land." Yet the existence of multiple, contradictory definitions is a textbook example of ambiguity. See

Further relying on its erroneous conclusion that the Settlement Acts are unambiguous, the majority claims that the Indian canon of construction does not apply. As stated, the majority is wrong on both counts. But even if the Settlement Acts were not ambiguous, the Indian canon would still apply, because it mandates that "treaties 'must . . . be construed . . . in the sense in which they would naturally be understood by the Indians.'" South Dakota v. Bourland, 508 U.S. 679, 701 (1993) (quoting

e.g., Watt v. Western Nuclear, Inc., 462 U.S. 36, 41-42 (1983) ("As this Court observed . . . the word 'minerals' is 'used in so many senses, dependent upon the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case.'") (quoting Northern Pacific R. Co. v. Soderberg, 188 U.S. 526, 530 (1903)). See also United States v. Williams, 553 U.S. 285, 294-95 (2008) (Scalia, J.) (relying on the fourth dictionary definition of "promotes" and dictionary definition 3a of "presents.")

A good example of a definition of "land" that does include water can be found in the very dictionary that Maine relies on in its brief: "Any ground, soil, or earth whatsoever, as meadows, pastures, woods, etc., and everything annexed to it, whether by nature, as trees, water, etc., or by the hand of man, as buildings, fences, etc.; real estate." http://www.webster-dictionary.org/definition/land (eighth definition) (last visited June 23, 2017) (emphasis added). Similar definitions can be found in other dictionaries. See, e.g., http://www.wordreference.com/definition/land (last visited June 23, 2017)(fifth definition) ("any part of the earth's surface that can be owned as property, and everything connected to it"); http://www.dictionary.com/browse/land (last visited June 23, 2017) (definition 5a) ("any part of the earth's surface that can be owned as property, and everything annexed to it, whether by nature or by the human hand.") See also http://www.dictionary.com/browse/land (last visited June 23, 2017) (seventh definition) ("A part of the surface of the earth marked off by natural or political boundaries or the like; a region or country" -- which plainly can include water.")

- 33 -

Washington v. Wash. State Commercial Passenger Fishing Vessel Assn., 443 U.S. 658, 676 (1979); Jones v. Meehan, 175 U.S. 1, 11 (1899)). As the record establishes, the natural understanding of the Penobscots is that the River and the Islands are one and the same; to the Nation, the waters and the bed of the River are so intimately connected to the uplands of the islands, that no distinction between the two is made. Indeed, the Penobscot locution "to fish my islands" means to fish the waters surrounding the uplands of those islands. The majority, however, believes that the Nation, negotiating the Settlement Agreements from a position of strength -- having just established before this court that it had a claim to approximately two-thirds of Maine, see, e.g., Joint Passamaquoddy Tribal Council v. Morton, 528 F.2d 370, 370 (1st Cir. 1975) -- ceded the Penobscot River that it has fished since time immemorial and values so greatly.

Indeed, at the urging of none other than Maine itself, this court previously had no difficulty in accepting that both the Penobscot and Passamaquoddy reservation "lands" embraced "waters." See Maine v. Johnson, 498 F.3d 37, 47 (1st Cir. 2007). [22] But

---

[22] Clutching at straws the majority claims that, in the present dispute, Maine was not on notice of its own position in Johnson. Supra at 22 n.10. The majority also claims that Johnson "concerned an entirely different issue;" that "[i]t is simply not true that this court has held in Johnson that the definition of Reservation embraced the waters of the Penobscot River;" that this dissent relies merely on a footnote in Johnson; that the Nation and the United States refer only "glancingly" to that footnote;

today, the majority gives short shrift to our holding in Johnson. The majority also "see[s] no necessary contradiction" between Maine's position in Johnson that the Reservation includes a part of the Penobscot River, and its present position (and the majority's holding) that no part of the River is included. But there is a clear contradiction -- for which Johnson's words speak the loudest and clearest.

---

and that this dissent therefore makes the argument for them that Johnson decides the present case. Supra at 22.

I have difficulty accepting that Maine must be put on notice of its own position. In any event, both the Nation and the United States have extensively argued that Maine (until its sudden change of heart in 2012) had consistently taken the position that the Reservation includes at least some of the waters of the Penobscot River, citing various documents which I lay out in Section I infra. Maine was thus on notice that its present position is in conflict with its prior position. As I will explain in further detail, the majority's decision is in fact in direct contradiction with the holding of Johnson, and that holding is based on much more than a single footnote. See infra Section III. Furthermore, the Nation and the United States have both referred to Johnson much more that "glancingly" in their arguments. For instance, in a section of its brief dedicated to showing that the Nation has retained as its reservation that which it has not ceded in its treaties with Massachusetts and Maine, the Nation writes that

> this Court has said that the question of whether the boundaries of the Penobscot Indian Reservation include the waters of the River turns on whether those waters were "retained by the tribe[] . . . based on earlier [treaty] agreements between the tribe[] and Massachusetts and Maine." Johnson, 498 F.3d at 47 (emphasis in original)

Both the Nation and the United States also rely on Johnson in their reply briefs; indeed, the United States does so on the very first page of its reply brief.

## I.  Context and History

Contrary to the majority's myopic view, it is necessary to understand the "unique history" of the Settlement Acts to decide the present case.  Johnson, 498 F.3d at 47.  Supreme Court precedent and the Settlement Acts require that we look at that history.[23]  See infra Sections II and III.

What the majority terms "the dissent's version of history," supra at 23, is principally drawn from primary sources, such as the 1796, 1818, and 1833 treaties between Massachusetts or Maine and the Nation, from Congressional Reports, and from letters and filings by Maine's own attorneys general and one of its solicitors general.  The history here is also drawn from our own case law.

The relevant history commences with the epoch of the American Revolution, a time when the Nation had aboriginal title to land which was "centered on the Penobscot River," located in the then-Massachusetts territory of Maine.  H.R. Rep. No. 96-1353, at 11 (1980).  As the Revolution began, General George Washington sought the assistance of the Native American tribes in Maine, including the Penobscots.  Id.  Colonel John Allan of the

---

[23]  I summarize only the most relevant history here.  The interested reader may find more extensive descriptions of the history in, among others: Penobscot Nation v. Stilphen, 461 A.2d 478 (Me. 1983), and Passamaquoddy Tribe v. Maine, 75 F.3d 784 (1st Cir. 1996).

Massachusetts militia negotiated a treaty with the Penobscots and the other tribes, promising the protection of their lands in exchange for their assistance in the war.  Id. at 11-12.

Unfortunately, this promise did not last much past the birth of the United States.  Id. at 12.  Massachusetts (which then still included the territory of Maine), cash-strapped at the time, sought to buy land from the Indians to resell at a profit.  Id. After the Penobscots successfully rebuffed numerous such attempts, they eventually yielded, and entered into two treaties ceding some of their lands.  In the first treaty, in 1796, the Nation ceded, within a 30-mile tract, "all the lands on both sides of the Penobscot River."  Vine Deloria, Jr. et al., Documents of American Indian Diplomacy: Treaties, Agreements, and Conventions 1094 (1st Ed. 1999).  These lands were six miles wide.  Id.  The bargain was typically one-sided.  The Nation received no money, but rather specified quantities of "blue cloth for blankets," "shot," "[gun][p]owder," "hats," "[s]alt," "New England Rum," and "corn." Id.  In the second treaty, in 1818, the Nation ceded the remainder of its lands on both sides of the river, reserving only four townships on those lands for the Nation's "perpetual use."  Treaty Made by the Commonwealth of Massachusetts with the Penobscot Tribe of Indians, 1843, Me. Acts 243 (1818).  In exchange, the Nation again received tokens, inter alia, a "cannon," "knives," and "drums."  Id.

When Maine obtained statehood in 1820, it assumed Massachusetts's treaty obligations to the Indians. In 1833, Maine purchased, for $50,000, the four townships on the shore of the Penobscot River that had been euphemistically reserved for the Nation's "perpetual use."

As it turned out, however, in all these dealings with the Nation, both Massachusetts and Maine had proceeded in violation of the Indian Nonintercourse Act, 25 U.S.C. § 177, which prohibited any transfer of land from Indians without Congressional approval. See Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370, 377 (1st Cir. 1975). These two states neither sought nor obtained Congressional ratification of their treaties with the Nation. H.R. Rep. No. 96-1353, at 11 (1980).

When this violation surfaced in the 1970s, the Penobscot Nation initiated litigation claiming that, because neither Maine nor Massachusetts ever sought the required approval from Congress the treaties with Congress, the land transfers were void ab initio and the Nation had therefore retained legal title to its aboriginal lands, which amounted to nearly two-thirds of Maine's land mass. Other tribes initiated several similar claims. These litigations led to settlement discussions, and resulted in the passage of the Settlement Acts in 1980.

The Settlement Acts embodied a compromise, the core of which was that the Nation received increased sovereignty (previous

to the Settlement Acts, Maine did not consider the Nation to have any sovereignty[24]) and a fund was provided by the federal government to reacquire some of the Nation's lost lands.  To the benefit of Maine, Congress retroactively ratified the land transfers of 1796, 1818, and 1833, and provided that the Nation would be generally subject to Maine law.  See 25 U.S.C. § 1723; 30 M.R.S.A. § 6204.  In essence, the Nation became akin to a municipality under Maine law, but one with additional sovereignty over, inter alia, "internal tribal matters," "sustenance fishing," and "hunting and trapping."  See 30 M.R.S.A. §§ 6206, 6207.

Congress -- House and Senate alike -- ratified the MIA on the understanding that the Nation's rights to hunt and to fish were both "expressly retained sovereign activities," and that the tribes had the "permanent right to control hunting and fishing within . . . their Reservations," whereas the State had only a "residual right to prevent the two tribes from exercising their hunting and fishing rights in a manner which has a substantially

---

[24]  See, e.g., Great Northern Paper v. Penobscot Nation, 770 A.2d 574, 581 (Me. 2001) ("[Prior to the Settlement Acts] Indians residing within Maine's borders were subjected to the general laws of the state like 'any other inhabitants' of Maine.  Although the Tribes were recognized in a cultural sense, they were simply not recognized by the state or the federal government in an official or 'political sense.'") (quoting State v. Newell, 24 A. 943, 944 (1892); United States v. Levesque, 681 F.2d 75 (1st Cir. 1982) (Criminal cases committed in Indian country still outstanding after passage of the Settlement Acts were tried in the United States District Court for the District of Maine).

adverse effect on stock in or on adjacent lands or waters." S. Rep. No. 96-957, at 15, 17 (1980); H.R. Rep. No. 96-1353, at 15, 17 (1980). That these provisions would receive such importance is only natural, given that Congress understood that the Penobscots were a "riverine" people, whose "aboriginal territory . . . is centered on the Penobscot River." H.R. Rep. 96-1353 at 11 (1980). In fact, the sustenance fishing provision was amended several times to accommodate the concerns of the parties.

Indeed, the Penobscots have fished, hunted, and trapped on the River since time immemorial. The River is the only place within their Reservation where the Penobscots can fish, because the uplands of their islands have no surface water where this activity can be conducted. Fishing is central to Penobscot culture, because fish is not only a major traditional source of sustenance, but is also central to many of the Nation's rituals and traditions.

It is not only the Penobscots who have understood the Main Stem to be part of their Reservation since the Settlement Acts came into force; the United States has consistently taken this position as well (and does so once more in the present case). Thus, in 1995 and 1997 filings before the Federal Energy Regulatory Commission ("FERC"), the Department of the Interior ("DOI"), took the position that the Main Stem is part of the Reservation, principally because the 1818 Treaty did not cede the Penobscot

- 40 -

River to Massachusetts.  The federal government has also repeatedly granted the Nation funding for water resources planning, fisheries management, and water-quality monitoring of the River.

The Maine Indian Tribal-State Commission -- an entity created by the Settlement Acts for the purpose of, inter alia, "continually review[ing] the effectiveness of this Act and the social, economic and legal relationship between the Houlton Band of Maliseet Indians, the Passamaquoddy Tribe and the Penobscot Nation . . . ,"  30 M.R.S.A. § 6212(3) -- has also consistently taken the position that the Main Stem is within the Nation's Reservation.  See Friederichs, Zyl-Navarro, and Bertino, The Drafting and Enactment of the Maine Indian Claims Settlement Act, (February 2017) (commissioned by the Maine Indian Tribal-State Commission), available at http://www.mitsc.org/.

Maine has also understood the Main Stem, or at least a portion thereof, to fall within the Reservation.  Thus, in a 1988 letter, Maine's then-Attorney General Tierney stated that the Nation could "place gill nets in the Penobscot River within the boundaries of the Penobscot Reservation."  Me. Op. Atty. Gen. No. 88-2 (Me.A.G.), 1988 WL 483316 (emphasis added).  In a 1997 filing before the FERC, Maine's then-Solicitor General Warren stated that "the boundaries of the Penobscot Reservation . . . includ[e] the islands in the Penobscot River . . . and a portion of the riverbed between any reservation island and the opposite shore." (emphasis

- 41 -

added).  In fact, Maine's eel permits advised the public that "[t]he portions of the Penobscot River and submerged lands surrounding the islands in the river are part of the Penobscot Indian Reservation."  Maine reaffirmed its position before this court in 2006, when it argued in its brief that:

> To be clear, it is the State's position that the Penobscot Reservation includes those islands in the main stem above and including Indian Island that have not otherwise been transferred, as well as the usual accompanying riparian rights that likewise have not been transferred . . . . [25]

Brief of State of Maine as Intervenor-Respondent, at 3 n.2, Maine v. Johnson, 498 F.3d 37 (1st Cir. 2007) (Nos. 04-1363, 04-1375) (emphasis added).  In the same litigation, Maine insisted that in order to determine the exact boundaries of the Reservation, it was necessary to analyze "the relevant treaties referenced in the Reservation definitions in the [MIA] including historical transfers of Reservation lands and natural resources (30 M.R.S.A. §§ 6203(5) and (8)), and aspects of Maine property law."  Brief for Petitioner State of Maine at 58, Johnson, 498 F.3d (Nos. 04-1363, 04-1375).

In that same litigation, this court accepted that the Penobscot Reservation included at least a part of the Penobscot

---

[25]    The usual riparian rights include ownership of the submerged lands (i.e. the river bed) around the islands.  See infra Section III.

River, but did not resolve what part that was.  The court had no difficulty in referring to Indian "lands" as encompassing "waters."  See Johnson, 498 F.3d at 47.

Yet, thereafter in 2012, only five years after Maine had argued to this court that the Penobscot Indian Reservation included a part of the Penobscot River -- and more than 30 years after the Settlement Acts came into force -- Maine's then-Attorney General William Schneider wrote to the Nation informing it that no part of the River is within its Reservation.  This sudden change in Maine's position, embodying an attempt to breach the agreement contained in the Settlement Acts, sparked the present litigation.

## II.  Supreme Court Precedent is Dispositive

Alaska Pacific Fisheries definitively established the rule of law that determines that the Penobscot Indian Reservation includes the Main Stem.  Although the majority acknowledges that there are "superficial similarities" between Alaska Pacific Fisheries and the present case, it tries to downgrade the holding. Supra at 18. In fact, the similarities are not "superficial," they are profound.

In Alaska Pacific Fisheries,

> [t]he principal question for decision [was] whether the reservation created by the Act of 1891 embraces only the upland of the islands or includes as well the adjacent waters and submerged land. The question is one of construction -- of determining what Congress

- 43 -

> intended by the words 'the body of <u>lands</u> known
> as Annette <u>Islands</u>.'

248 U.S. at 87 (quoting Comp. St. 1916, § 5096a) (emphasis added).

The Supreme Court unmistakably held that the reservation included the adjacent waters and submerged land. <u>Id.</u> at 89.

To arrive at this conclusion, the Supreme Court looked not to a dictionary, but rather observed that

> As an <u>appreciation of the circumstances in which words are used</u> usually is conducive and at times is essential to a right understanding of them, <u>it is important, in approaching a solution of the question stated, to have in mind the circumstances in which the reservation was created</u> -- the power of Congress in the premises, the location and character of the islands, <u>the situation and needs of the Indians and the object to be attained.</u>

<u>Id.</u> at 87 (emphasis added).

If one follows the Supreme Court's analysis step-by-step, the majority's grievous errors become clearly apparent. At the threshold, a comparison between the language at issue in <u>Alaska Pacific Fisheries</u> and the language at issue here is in order.

In <u>Alaska Pacific Fisheries</u>, the relevant phrase was "the body of lands known as Annette Islands, situated in Alexander Archipelago in Southeastern Alaska," <u>Id.</u> at 86 (quoting Act of March 3, 1891, c. 561, § 15, 26 Stat. 1095, 1101). In the present case, there is a two-part relevant text. First, the MICSA defines

the Reservation as "those lands as defined in the [the MIA]."  25

U.S.C. § 1722(i).  Second, the MIA defines the Reservation as

> the islands in the Penobscot River reserved to
> the Penobscot Nation by agreement with the
> States of Massachusetts and Maine consisting
> solely of Indian Island, also known as Old
> Town Island, and all islands in that river
> northward thereof that existed on June 29,
> 1818, excepting any island transferred to a
> person or entity other than a member of the
> Penobscot Nation subsequent to June 29, 1818,
> and prior to the effective date of this Act.

30 M.R.S.A. § 6203(8).  The definition in Alaska Pacific Fisheries

and the definition here are highly similar.  Neither definition

mentions waters or submerged lands, but refers only to "lands" and

"islands."  Both definitions specify which islands are included in

the reservations.  One definition does this by using the name the

islands are known under ("Annette Islands"); the other definition

does this by referring back to previous treaties in which the

Nation retained islands, then using the name of one island ("Indian

Island, also known as Old Town Island"), and then detailing which

other islands are intended ("all islands in that river northward

thereof").  Finally, both definitions also specify where these

islands are located: one is  "situated in Alexander Archipelago in

Southeastern Alaska" and the other "in the Penobscot River."

Rather than being "superficial[ly] similar[]," Alaska Pacific

Fisheries unquestionably establishes the proper methodology for

determining the demarcation of the Nation's Reservation in the present case.

Alaska Pacific Fisheries mandates an approach to interpreting statutes that do not expressly grant waters or submerged lands to the Indians -- an approach that looks not to a dictionary, but rather places the statute in its context, and looks to Congressional intent. If the Supreme Court had applied the majority's approach to the definition at issue in Alaska Pacific Fisheries, then it would not have held that the reservation at issue included waters or submerged lands. But the Supreme Court did not apply the majority's approach, and concluded that the reservation did include waters and submerged lands. The majority's approach is thus precluded by binding Supreme Court precedent.[26]

---

[26] Based on the language of the respective statutes, the majority attempts to distinguish Alaska Pacific Fisheries from the present case. This attempt fails. The majority cites the word "solely" in the MIA. But the majority fails to see that "solely" serves to specify which islands in the Penobscot River are included in the Reservation, and which are not -- not whether the Main Stem is excluded from the Reservation. Specifically, there are islands in the Penobscot River south of Indian Island (such as Marsh Island which is on the west side of Indian Island), and also islands north of Indian Island that were created after 1818, such as Gero Island. The legislative history reveals that Maine was particularly concerned that those post-1818 islands might be deemed included in the Reservation. The majority also argues that the phrase "in the Penobscot River" means that no part of the River is included in the Reservation. But the reference to the Penobscot River, like the reference to the "Alexander Archipelago" in Alaska Pacific Fisheries, serves to situate the Reservation. In addition, the words "in the Penobscot River" limit the size of the Reservation -- without these words, the Nation could claim all islands northward of Indian Island, regardless of which body of water they

- 46 -

Returning to the approach that Alaska Pacific Fisheries sets out, I commence with the statement in Alaska Pacific Fisheries, "[t]hat Congress had power to make the reservation inclusive of the adjacent waters and submerged land as well as the upland needs little more than statement." Id. Similarly, in the present case, Congress had the power to ratify -- or to decline to ratify -- any territorial arrangement between the Nation and Maine.

Next, it can easily be concluded that the analysis of the location and character of the islands in the present case is clearly in line with Alaska Pacific Fisheries. The Annette Islands are "separated from other islands by well-known bodies of water." Id. at 88. In the present case, the islands that are part of the Penobscot Indian Reservation are separated from other islands (such as those to the south of Indian Island), as well as from the banks of the Penobscot River, by a well-known body of water: the Main Stem of that very Penobscot River. The Supreme Court also remarked that the "salmon and other fish," that passed through the waters of the Annette Islands Reservation, gave "to the islands a value for settlement and inhabitance which otherwise they would not have." Id. Again, this applies in the present case. The Penobscots are a riverine people who have fished in the Main Stem since time immemorial, and for whom fishing is not only a key means

are in.

of sustenance, but also an inextricable part of their culture. The fish in the Main Stem thus give the Reservation islands a "value for settlement and inhabitance which otherwise they would not have."

Turning to the final step of the analysis, a major purpose of the Nation in entering into the Settlement Acts -- in addition to the fishing -- was increased sovereignty over its territory, and the regaining of some of the territory it had lost to Massachusetts and Maine in 1796, 1818, and 1833. Thus, surrendering the River upon which its aboriginal lands were centered was plainly not part of the Nation's purpose -- retaining the Main Stem was. Indeed, just like the Indians in Alaska Pacific Fisheries, "[t]he Indians naturally looked on the fishing grounds as part of the islands and proceeded on that theory in soliciting the reservation." Alaska Pacific Fisheries, 248 U.S. at 89.

The Supreme Court in Alaska Pacific Fisheries bolstered its holding by noting that, pursuant to the Indian canon of construction, "statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians." Id. at 89. Most assuredly, this applies in the present case as well. See Penobscot Nation, 164 F.3d at 709 (1st Cir. 1999) (applying the Indian canon of construction to the Settlement Acts). In Alaska Pacific Fisheries, the Court found further support for its holding

in the fact that, following enactment, the statute was treated by the Indians, the public, and the Secretary of the Interior as including the adjacent waters in the reservation.  As previously stated, this situation also exists in the present case.  Since the enactment of the Settlement Acts, the Nation and the United States have understood that the Reservation included the Main Stem.  Supra Section I.  Even Maine, until it recently reversed course, and the public it informed, understood that at least a part of the Main Stem was within the Nation's Reservation.  Id.

Alaska Pacific Fisheries has been applied in other cases that are instructive for present purposes.  Two cases -- which the majority addresses only in a conclusory footnote -- are particularly so.  First, in Hynes v. Grimes Packing Co., the Supreme Court applied Alaska Pacific Fisheries to conclude that "any other public lands which are actually occupied by Indians or Eskimos within said Territory [Alaska]," included "waters."  337 U.S. 86, 110-11 (1949) (emphasis added).  The Supreme Court observed that "one may not fully comprehend the statute's scope by extracting from it a single phrase, such as 'public lands' and getting the phrase's meaning from the dictionary," rather, the statute "must 'be taken as intended to fit into the existing system' and interpreted in that aspect."  Id. at 115-116.  Second, in Choctaw Nation v. Oklahoma, the Supreme Court had to determine whether a grant of "land" to the Choctaw Indians included submerged

lands in the Arkansas River. 397 U.S. 620, 621, 625 (1970). The relevant boundary was described simply as "'up the Arkansas' and 'down the Arkansas,'" and there was no reference in the grant to conveying that river or any submerged lands to the Indians. Id. at 631. Citing Alaska Pacific Fisheries, the Supreme Court noted that "the question is whether the United States intended to convey title to the river bed to petitioners," id. at 633, and concluded that the grant of "land" bounded by the Arkansas River included the submerged lands of that river. Id. at 635.

In light of Alaska Pacific Fisheries, the proposition that the words "lands" and "islands" refer only to land above the waters of the Penobscot River can very well be put to rest.[27] Additionally, the notion that one can resort to dictionary definition to resolve the present case can similarly rest in peace. The Reservation includes the Main Stem.

I continue, however, because the Nation and the United States have both presented arguments that, even without Alaska Pacific Fisheries, demonstrate that the Penobscot Indian Reservation includes the Main Stem.

---

[27] The majority never specifies at what water level the boundaries of the Penobscot Indian Reservation are to be determined. Indeed, according to the majority's interpretation, it would appear that the Penobscot Indian Reservation shrinks when the water levels in the River rise, and then expands when those levels fall.

## III.   The Nation Never Ceded the Main Stem to Massachusetts

> [T]he Indians are acknowledged to have the unquestionable right to the lands they occupy, until it shall be extinguished by a voluntary cession to the government; and . . . that right was declared to be as sacred as the title of the United States to the fee.

Leavenworth v. United States, 92 U.S. 733, 742 (1876).  The Settlement Acts were enacted against the backdrop of an unextinguished and "sacred" right of the Indians inhabiting Maine to approximately two-thirds of that state's landmass.  I commence with the uncontested proposition that this aboriginal title included the Penobscot River and its bed.  Congress enacted the Settlement Acts on the understanding that the tribes would surrender their aboriginal title, but "would retain as reservations those lands and natural resources which were reserved to them in their treaties with Massachusetts."  S. Rep. No. 96-957, at 18 (1980); H.R. Rep. No. 96-1353, at 18 (1980).

This understanding is reflected in the language of both MICSA and the MIA.  Thus, MICSA retroactively ratified the transfer of lands in the 1796, 1818, and 1833 treaties:  "Any transfer of land or natural resources located anywhere within the United States from, by, or on behalf of . . . the Penobscot Nation . . . shall be deemed to have been made in accordance with the Constitution and all laws of the United States . . . ."  25 U.S.C. § 1723(a)(1).  MICSA then extinguishes the Nation's aboriginal claim as to the

- 51 -

lands or natural resources transferred in the 1796, 1818, and 1833 treaties. 25 U.S.C. § 1723(b). But the Nation did not transfer the Main Stem in those treaties.

The language of the MIA also reflects Congress's understanding that the Nation would retain what it had not ceded in its treaties with Massachusetts and Maine. The MIA refers those treaties in the very definition of the Penobscot Indian Reservation: "'Penobscot Indian Reservation' means the islands in the Penobscot River reserved to the Penobscot Nation by agreement with the States of Massachusetts and Maine . . . ." 30 M.R.S. § 6203(8). The majority effectively reads this language out of the MIA. By taking this language as "merely language specifying which 'islands' are involved," supra at 16, the majority renders the language superfluous -- because the MIA already specifies which islands are included in the Reservation: "solely . . . Indian Island, also known as Old Town Island, and all islands in [the Penobscot R]iver northward thereof that existed on June 29, 1818 . . . ." 30 M.R.S. § 6203(8). The majority's reading "is thus at odds with one of the most basic interpretive canons, that '"[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous,

void or insignificant . . . ."'" Corley v. United States, 556 U.S. 303, 314 (2009).[28]

Admittedly, if one relies on the text of the MIA standing alone, the majority's reading -- that the reference to the 1796, 1818, and 1833 treaties merely serves to specify which islands are part of the Reservation -- is not impossible. However, "[w]hen we are faced with these two possible constructions, our choice between them must be dictated by a principle deeply rooted in this Court's Indian jurisprudence: 'Statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation, 502 U.S. 251, 269 (1992) (quoting Montana v. Blackfeet Tribe, 471 U.S. 759, 766 (1985)).

Thus, not only do the purpose and legislative history of the Settlement Acts lead to the conclusion that the Nation has

---

[28]  The majority attempts a similar argument with respect to section 6205(3)(A) of the MIA, which states that "[f]or purposes of this section, land along and adjacent to the Penobscot River shall be deemed to be contiguous to the Penobscot Indian Reservation." 30 M.R.S.A. § 6205(3)(A). The majority argues that this implies "that otherwise the 'Reservation' is not contiguous to land along and adjacent to the Penobscot River;" and that including the Main Stem in the Reservation "would render that language superfluous." Supra at 13. What the majority apparently fails to take into account is that the Penobscot River also runs for approximately 30 miles south of the Main Stem. Thus, section 6205(3)(A), far from being redundant, serves the purpose of rendering land along and adjacent to any part of the Penobscot River (including south of the Reservation) contiguous to the Reservation.

retained what it has not ceded -- but the Indian canon of construction mandates that conclusion, for the Indians never ceded the Penobscot River in the 1796, 1818, and 1833 treaties. To understand why this is the case, it is essential to examine those treaties.

In the 1796 and 1818 treaties, the Nation ceded its "land" on both sides of the Penobscot River -- but Old Town Island, and all the islands in the River northward thereof, were reserved for the Tribe; the 1818 treaty also reserved four townships to the Nation, which were then sold to Maine in the 1833 treaty. None of these treaties explicitly mention the River being conveyed to Massachusetts or to Maine, nor do they mention it being reserved for the Indians.

> [W]e will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand, in all cases where power is exerted by the strong over those to whom they owe care and protection,' and counterpoise the inequality 'by the superior justice which looks only to the substance of the right, without regard to technical rules.'

United States v. Winans, 198 U.S. 371, 380-81 (1905). The Nation views the Penobscot River as part of the islands, and in the 1796, 1818, and 1833 treaties, the Nation retained those islands, and thus naturally understood that it retained the River as well. The Nation ceded only "land" on both sides of the River, which it naturally understood to refer only to the uplands on both sides of

the River.  Thus, the Nation retained the River in the 1796, 1818, and 1833 treaties.

But even reading the treaties technically leads to the conclusion that the Nation retained the Main Stem.  Under Massachusetts, as well as Maine, common law,[29] the river beds of non-tidal rivers are considers submerged lands, and are privately owned,[30] presumptively by the owner of the abutting uplands, who may be referred to as a riparian owner.  McFarlin v. Essex Co., 64 Mass. 304, 309-10 (Mass. 1852); In re Opinion of the Justices, 106 A. 865, 868-69 (Me. 1919).  The Penobscot River, in relevant part, is non-tidal.  Veazie v. Dwinel, 50 Me. 479, 479 (Me. 1862).  When two different persons own land on opposite sides of the River, each presumptively owns the submerged land to the "thread" (i.e. midline) of the river; the same holds true for owners of islands -- they, too, presumptively own the submerged lands to the thread of the river between the island upland and the upland on the river bank.  See Warren v. Westbrook Mfg. Co., 86 Me. 32, 40 (Me. 1893).  Ownership of submerged lands brings with it certain rights, such as the exclusive right to fish in the waters above the submerged

---

[29]  Because Massachusetts and Maine common law are identical in all respects that are material here, I here cite to both, leaving to the side the question of whether Maine or Massachusetts law should apply to a given treaty or issue.

[30]  Unlike the beds of tidal rivers, which cannot be privately owned, but are rather owned by the state for the benefit of all citizens.  Storer v. Freeman, 6 Mass. 435, 438 (Mass. 1810).

lands; it also brings with it certain obligations, such as allowing the public passage through the waters above the submerged lands. McFarlin, 64 Mass. at 309-10; In re Opinion of the Justices, 106 A. at 868-69.

In an arm's-length transaction, the presumption would be that the Nation ceded its submerged lands until the thread between its retained islands and the banks of the River. But Massachusetts, as well as Maine, law recognizes that the presumption is defeated where the transaction was not at arm's length, especially where, as here, the grantor does not understand that he or she is relinquishing title to the submerged lands. See Hatch v. Dwight, 17 Mass. 289, 298 (Mass. 1821); Hines v. Robinson, 57 Me. 324, 330 (Me. 1869).

Note that, even if (as the majority) one reads the 1796, 1818, and 1833 treaties out of the Settlement Acts, state law still informs the meaning of those Acts. Varity v. Howe, 516 U.S. 489, 502 (1996) ("The dissent looks to the dictionary for interpretive assistance. Though dictionaries sometimes help in such matters, we believe it more important here to look to the common law . . . .") (citing Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322 (1992)). This is especially true in this case, because Maine insisted that Maine law apply to the Penobscots. Supra Section I; 30 M.R.S.A. §§ 6202, 6204. Section 6204 of the MIA is

even entitled "Laws of the State to apply to Indian Lands."[31]  "Laws of the State," in turn, is defined to include "common law."  30 M.R.S.A. § 6203(4).  And if islands include submerged lands, and the Nation's Reservation includes islands, then, by simple deduction, the Nation's Reservation includes submerged lands.[32]

The United States, the Nation, and Maine (until Maine suddenly changed its mind in 2012) have consistently taken the position that the Reservation was defined with reference to the 1796, 1818, and 1833 treaties and state common law.  Supra Section I.  In fact, it was Maine who -- before this court in Johnson -- was adamant that the boundary issue "involves analysis of the relevant treaties referenced in the Reservation definitions in the [MIA] including the historical transfers of Reservation lands and natural resources (30 M.R.S.A. §§ 6203(5) and (8)), and aspects of Maine property law."  Brief for Petitioner State of Maine at 58, Maine v. Johnson, 498 F.3d 37 (1st Cir. 2007) (Nos. 04-1363, 04-1375) (emphasis added).

---

[31]  Although the Penobscots did negotiate a few exceptions to the general rule that they are subject to Maine law, none of those exceptions could support the proposition that the Indians somehow surrendered their property rights under Maine law.  See, e.g., 30 M.R.S.A. §§ 6206, 6207.

[32]  Citing no authority, the majority, however, asserts that state common law, including law for the construction of deeds, should not figure in our construction of the Settlement Acts. Supra at 19 n.9.

Contrary to the majority's protestation that Johnson "did not present the issue of the meaning of Penobscot Indian Reservation in the Settlement Acts," Johnson did just that. Johnson concerned a dispute over the allocation of regulatory authority over waste discharges into water between Maine, the EPA, and the Indians (specifically, the Nation and the Passamaquoddy Tribe). In order to resolve that dispute, this court had to address the meaning of the Reservation.[33] For in order to determine that the Nation did not have regulatory authority as to two discharge facilities, this court had to decide whether those facilities discharged into territory "acquired by the Secretary [of the Interior] in trust" for the Nation, or whether it discharged into the Reservation.[34] Johnson, 498 F.3d at 47. As the majority itself puts it, in Johnson, we "distinguishe[d] between Reservation lands and land later acquired in trust." Supra at 22. We made that distinction by observing that the Reservation,

_____

[33] Note that in order for the Nation to have standing in a case concerning waste discharges into water, its Reservation had to include at least some part of the Penobscot River. We decided the Nation's claims in Johnson on the merits, thus determining that the Nation had standing and, implicitly, that the Reservation included some part of the River. Restoration Pres. Masonry, Inc. v. Grove Eur. Ltd., 325 F.3d 54, 59 (1st Cir. 2003) (We do not assume the existence of Article III jurisdiction).

[34] The Nation's Territory is comprised of its Reservation plus any lands acquired by the Secretary of the Interior for the benefit of the Nation. 30 M.R.S.A. § 6205(2). The Nation's regulatory authority is different in its territory and its reservation. See, e.g., 30 M.R.S.A. § 1724(h).

unlike the Territory, contained "reservation waters <u>retained</u> by the [Penobscot and Passamaquoddy] tribes under the [MIA], based on earlier agreements between the tribes and Massachusetts and Maine."  <u>Johnson</u>, 498 F.3d at 47 (original emphasis).  We then clarified that we arrived at this conclusion because we read the MIA as "defin[ing] [the Nation's] reservation lands as those <u>reserved to the tribe</u>[] by agreement with Massachusetts and Maine and not subsequently transferred."  <u>Id.</u> at 47 n.11 (citing 30 M.R.S.A. § 6203(5), (8)) (emphasis added).[35]  The majority is correct insofar as it notes that, in <u>Johnson</u>, we bypassed the issue of the Reservation's exact boundaries.  But we did hold that the Reservation was defined in terms of what the Nation retained, and that the Reservation included some part of the Penobscot River -- which directly conflicts with the majority's view that the Reservation is defined by the dictionary, and includes no part of River.

It is therefore nothing short of stunning that the majority today holds that the 1796, 1818, and 1833 treaties are unambiguously excluded from the Settlement Acts.  Apparently, the majority believes that this court in <u>Johnson</u> was not merely wrong,

---

[35]  The majority seeks to characterize my reliance on <u>Johnson</u> as being based merely on footnote 11 in that case.  <u>Supra</u> at 22. As this discussion makes clear, I am not relying merely on that footnote, although it does provide useful clarification.  As for the majority's other attempts to argue that reliance on <u>Johnson</u> is not proper, I have addressed those in footnote 22, <u>supra</u>.

but that it completely misread an unambiguous provision. Notwithstanding the majority's protestations, in <u>Johnson</u>, this Court had no difficulty in referring to Indian "lands" as including "waters." <u>Id.</u> at 45 ("[T]wo source points . . . drain into navigable waters <u>within what we assume to be tribal land</u>.") (emphasis added); <u>Id.</u> at 47 ("[T]he facilities . . . <u>discharge onto reservation waters</u> . . . . That such lands may be subject to . . . .") (emphasis added).

## IV. The Nation's Right to Fish "within" its Reservation

In a section entitled "Sustenance fishing within the Indian reservations," the MIA provides that

> Notwithstanding any rule or regulation promulgated by the commission[36] or any other law of the State, the members of the Passamaquoddy Tribe and the Penobscot Nation may take fish, <u>within the boundaries of their respective Indian reservations</u>, for their individual sustenance . . . .

30 M.R.S.A. § 6207(4) (emphasis added).

This provision was carefully negotiated and was amended several times to accommodate the concerns of the parties. The provision was understood by all involved to be central to the Nation's position -- and indeed to its very existence and culture

---

[36] Referring to the Maine Indian Tribal-State Commission. <u>See</u> <u>supra</u> Section I.

-- and was one of the very few exclusions in the MIA to the applicability of Maine law to the Nation and its lands.[37]

The fact that the Indians can fish "within" their Reservation implies that there is a place to do so.  Unless the majority is of the view that one can fish where there is no water, there is no place to fish on the uplands of the Nation's islands -- which implies that some part of the River has to be a part of the Reservation.  The previous two sections of this dissent have already explained why that part of the River is the Main Stem, so I will not belabor that point here.

What is worth repeating, however, is just how strongly the sustenance fishing provision implies that the Nation's Reservation embraces a part of the River.  Given the attention paid to this provision and to the importance of sustenance fishing to the Nation, the grant of fishing rights within the boundaries of the Reservation was not accidental.  This is especially so given that Congress knows how to grant fishing or others rights to Indians outside of their reservations.  See, e.g., Washington v.

_____

[37]    The majority appears to believe, however, that this provision (or at least the reference to the Reservation therein) is "ancillary," because the provision applies to both the Passamaquoddy and the Penobscot Reservations.  Supra at 16.  I fail to see how a provision that grants additional rights not only to the Penobscots, but also to the Passamaquoddy, is thereby rendered less significant to the Nation's position -- if anything, because the provision applies to two distinct reservations, rather than only to one, it carries more weight, not less.

Wash. State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 674 and n.21 (1979) (holding that six treaties granted Indians off-reservation fishing rights, through the following language (or language materially identical thereto): "The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory . . . .").

The majority correctly points out that the Nation has hunting and trapping rights as well within its territory, which is much larger than its Reservation. Supra at 14 n.6, 15; 30 M.R.S.A. §§ 6207(1)(A), 6205(2), 6207(1). However, the majority -- incorrectly -- views this hunting and trapping provision as providing only weak support for the position of the United States and the Nation. What the majority fails to see is that section 6207 sets up a detailed scheme allocating authority over fishing between the Nation, the Maine Indian Tribal State Commission,[38] and the state. Thus, section 6207(1)(A) (which gives the Indians hunting and trapping rights) is part of section 6207(1), which gives Indians the "exclusive authority within their respective Indian territories to promulgate and enact ordinances regulating" not only "[h]unting, trapping or other taking of wildlife," but also "[t]aking of fish on any pond in which all the shoreline and

_____

[38] Referring to the Maine Indian Tribal-State Commission. See supra Section I.

- 62 -

all submerged lands are wholly within Indian territory and which is less than 10 acres in surface area."  30 M.R.S.A. §§ 6207(1). Section 6207(3) then goes on, in painstaking detail, to delineate the areas in which the commission shall have "exclusive authority to promulgate fishing rules or regulations," again with reference to "Indian territory."[39]  30 M.R.S.A. §§ 6207(3).  Section 6207(6) then lays out what authorities and duties Maine's Commissioner of Inland Fisheries and Wildlife has within Indian territories.

Given this meticulous delineation of who has what authority over fishing -- and where, exactly, that authority applies -- a provision that gives Indians sustenance fishing rights within their <u>reservations</u> "[n]otwithstanding any rule or regulation promulgated by the commission or any other law of the State" is highly significant.  30 M.R.S.A. § 6207(4).  This provision plainly implies that those reservations include places

_____

[39]  To wit, the commission has such authority in:

    A. Any pond other than those specified in subsection 1, paragraph B, 50% or more of the linear shoreline of which is within Indian territory;
    B. Any section of a river or stream both sides of which are within Indian territory; and
    C. Any section of a river or stream one side of which is within Indian territory for a continuous length of ½ mile or more.

30 M.R.S.A. § 6207(3).

in which to fish.  In the case of the Penobscot Reservation, that means that the Main Stem is part of the Reservation.

The majority, however, argues against this necessary implication by relying on the boilerplate phrase "unless the context indicates otherwise" that applies to the definitions section of the MIA.  30 M.R.S.A. § 6203; supra at 15.  But the majority never explains in what way the "context indicates otherwise."  In fact, as I have just explained, the context indicates that "reservations" in the sustenance fishing provision was used to mean exactly that -- reservations, as including the Main Stem.  30 M.R.S.A. § 6207(4).  It is only through the majority's forced reading of the definition of the Nation's Reservation that a tension is even created between that definition and the sustenance fishing provision.  But even assuming that this tension exists, that the Settlement Acts somehow offer two definitions of the Reservation, I am forced to repeat that "[w]hen we are faced with these two possible constructions, our choice between them must be dictated by a principle deeply rooted in this Court's Indian jurisprudence: 'Statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'"  Cty. of Yakima, 502 U.S. at 269 (quoting Montana, 471 U.S. at 766).[40]

_____

[40]  Because the Main Stem is part of the Reservation, there is no need for this court to reach the second issue, namely whether

## V. Conclusion

As previously elaborated, there are at least three reasons -- each of which is sufficient by itself -- why the Penobscot Indian Reservation includes the Main Stem of the Penobscot River. First, the Supreme Court's binding precedent, especially Alaska Pacific Fisheries, establishes that the words "lands" and "islands" can include contiguous waters and submerged

---

the Nation has standing to sue for a declaratory judgment that it has a right to sustenance fishing in the Main Stem. Plainly, section 6207(4) of the MIA gives the Nation this right. The 2012 letter from Maine's then-Attorney General Schneider (the letter that has given rise to this dispute) acknowledges that "the Penobscot Nation has authority to regulate hunting and fishing on those islands included in its Reservation . . . ." The letter proceeds to explain that "[t]he River itself is not part of the Penobscot Nation's Reservation, and therefore is not subject to its regulatory authority or proprietary control." But the Main Stem of the River is, in fact, part of the Reservation, and the question of whether the Penobscots can fish in the Main Stem is therefore moot.

If I were to reach the issue of standing and ripeness, however, I would still find that the Indians have standing and that their claim is ripe. An Indian Nation or Tribe has the standing to seek declaratory and injunctive relief where its sovereignty is put in question, even absent any other concrete harm. See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 468 n.7 (1976). As already amply elaborated upon herein, the Nation views its right to sustenance fishing as an essential element of its sovereignty, and Congress understood the hunting and fishing provision as recognizing the Nation's exercise of "inherent sovereignty," and considered hunting and fishing "expressly retained sovereign activities." S. Rep. No. 96-957, at 14-15 (1980); H.R. Rep. No. 96-1353, at 14-15 (1980). A declaration from Maine, therefore, that the Nation has no such right (even if Maine does not, at present, intend to interfere with the Nation's sustenance fishing) is calling the Nation's sovereignty into question.

lands.  On the facts of the present case, there is no question that they do include the waters and submerged lands of the Main Stem.  Second, in the 1796, 1818, and 1833 treaties -- with reference to which the Reservation is defined -- the Nation retained the Main Stem; this is true even if we interpret the treaties technically in light of Maine and Massachusetts common law.  Third, the Settlement Acts provide the Nation with sustenance fishing rights within its Reservation -- a right that only makes sense and can only be exercised if the Reservation includes at least a part of the waters of the Penobscot River.

These three reasons are also mutually reinforcing.  For instance, Alaska Pacific Fisheries calls for an appraisal of, inter alia, the purposes which the Settlement Acts sought to attain; the sustenance fishing provision underscores that one of those purposes was to guarantee to the Nation sustenance fishing rights within its Reservation, without otherwise disturbing the carefully crafted regulatory balance of the Settlement Acts.  Alaska Pacific Fisheries also calls for an appraisal of the situation of the Nation -- which situation is clarified by the 1796, 1818, and 1833 treaties and state common law establishing that the Nation was in possession of the Main Stem when it entered into the Settlement Acts.

I cannot join in the majority's overreliance on dictionaries, to the exclusion of far more persuasive and common sense authority.

> [I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

Watt v. Alaska, 451 U.S. 259, 266 n.9 (1981) (quoting Cabell v. Markham, 148 F.2d 737, 739 (L. Hand, J.), aff'd, 326 U.S. 404 (1945)).

Respectfully, but most emphatically, I dissent.